UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BENJAMIN K. TOSCANO, | No. C-12-5893 EMC (pr) |
| Plaintiff, | |
| v. | **ORDER OF SERVICE AND PARTIAL DISMISSAL** |
| G. LEWIS, *et al.*, | |
| Defendants. | |

## I. INTRODUCTION

Benjamin Toscano, an inmate currently at Corcoran State Prison, filed this *pro se* civil rights action under 42 U.S.C. § 1983. Before the Court reviewed reviewed his complaint, Toscano filed an amended complaint, which is now before the Court for review under 28 U.S.C. § 1915A. Toscano's several miscellaneous motions also are before the Court.

## II. BACKGROUND

In his amended complaint, Mr. Toscano alleges the following about events that occurred over the last several years:

A.  Delayed Disclosure of Information

Two CDC-1030 confidential information disclosure forms[1] dated August 6, 2002 and May 24, 2004 indicated "that plaintiff was deemed 'no good' by the Northern Structure (NS) and Nuestra

---

[1] A CDC-1030 is used by prison officials to let the prisoner know that something from a confidential source has been used in a decision about him; the form states why it is considered reliable information, and describes the item in general terms without identifying, for example, the name of the inmate-informant.

1  Familia (NF), northern prison gangs and that plaintiff would be dealt with once he got a cell partner.
2  Therefore, knowing plaintiff was placed on a 'hit list' and targeted for assault." Docket # 8-1, p. 9
3  (errors in source). The information was not disclosed to Mr. Toscano until December 2, 2010, when
4  correctional officer ("C/O") Nealy issued the two CDC-1030 forms to him. *Id.* The CDC-1030
5  forms or the underlying documents had been submitted by the warden to the departmental review
6  board ("DRB") on an unstated date "for plaintiff's release from the security housing unit ("SHU")."
7  *Id.* Mr. Toscano filed unsuccessful inmate appeals about the delayed disclosure. *Id.* at 9, 11.

"Does 1-50 deliberately failed to disclose this information to keep plaintiff illegally and unlawfully housed in (SHU) in retaliation for plaintiff's previous lawsuits and complaints against officials." *Id.* at 9; *see also id.* at 9-10 (listing 14 inmate appeals filed between 2002 and 2010).

The CDC-1030 forms were not disclosed to him before his 2004 parole hearing or his most recent parole hearing because "defendants, Does 1-50, wanted the parole board to believe plaintiff was a gang member/associate to deny him any chance of parole" until his next parole hearing in 15 years *Id.* at 11; *see also id.* at 23-24. He filed an unsuccessful inmate appeal about the parole denials. *Id.* at 24.

B.  Gang Validation

Mr. Toscano was validated as a gang associate in or about 2007. In 2007, Mr. Toscano was subjected to an unclothed body search and a cell search after prison officials said that another inmate provided information about him. *Id.* at 12. No contraband was found. Prison officials then gave Mr. Toscano CDC-1030 forms dated July 26, 2002, April 24, 2004, and November 8, 2004 that were submitted by the institutional gang investigator Buchanan on March 15, 2007. *Id.*[2] On November 28, 2007, Mr. Toscano received a CDC-128B chrono that was authored by IGI C/Os Buchanan and McKinney, who had unsuccessfully tried to have him validated as an NF prison gang associate, but the form was rejected because the office of correctional safety ("OCS") knew it was false. *Id.* On

---

[2] Prison officials first gave him a form with another inmate's name on it, then retrieved the form, and later provided another copy of the same document without the other inmate's name and number on it. Docket # 8-1, p. 12. Toscano contends that the first form (i.e., the one with the other inmate's name on it) was given to him to expose that inmate as an informant. If true, this might give rise to a claim from the other inmate, but not a claim from Toscano, as it did not endanger Toscano.

2

an unstated date, Mr. Toscano received a CDC-128B chrono from C/O Doe that confirmed his validation as an NS associate by defendants Fisher, Marquez, Berkler, and Clower. *Id.* He unsuccessfully appealed the decision in 2008. *Id.* at 13.

C. <u>Protective Custody and Safety Issues</u>

As mentioned earlier, on December 2, 2010, Mr. Toscano received two CDC-1030 forms that indicated that he was deemed "no good" by prison gangs and would be dealt with by the gangs when he got a cellmate.

On March 28, 2011, Mr. Toscano was released from the SHU by several defendants "with full knowledge that plaintiff was targeted for assault/murder." *Id.* at 13. Warden Lewis, Lt. D. Barneburg, M. Ruff, F. Schoening, T. Rothchild, P. Kennedy, and Does 1-20 took part in his release. *Id.*

On April 6, 2011, Mr. Toscano asked defendant Webster to put him into protective custody and send him to a sensitive needs yard ("SNY") because he was "in fear for his life" and had been "targeted for assault/murder." *Id.* Webster said that a lieutenant would talk to Mr. Toscano and sent him back to his cell. A padlock was placed on Mr. Toscano's door for his safety. The next day, Mr. Toscano was interviewed by lieutenant Strain and provided information about other inmates. Lieutenant Strain wrote a CDC-114D notice that put Mr. Toscano in protective custody administrative segregation ("ad-seg"). Captain Bell reviewed and approved the CDC-114D. On April 8, prison officials searched the cells of "Northern inmates" as to whom Mr. Toscano had provided information, "making it obvious that plaintiff provided information against them." *Id.* at 14.

On or about April 15, 2011, sergeant Basso and Doe interviewed Mr. Toscano and told him he would go to the SNY in 2-3 weeks. *Id.* However, Mr. Toscano was told two days later by sergeant Countess that he would be in ad-seg from 6-12 months before he went to the SNY. Mr. Toscano filed an inmate appeal to sergeant Basso, who told him on April 20 that he (Basso) could stop his report and address the appeal or that he could finish typing his report so that Mr. Toscano would be sent to transitional program unit general population ("TPU-GP") for SNY. Mr. Toscano decided to proceed with the appeal. *Id.* at 14.

Two months later, Mr. Toscano was still housed in ad-seg. R. Clower came to his cell door on June 21, 2011, and made statements that others could hear and that "put plaintiff's life in danger because plaintiff was exercising his 1st Amend. right to appeal" about an allegedly false validation. *Id.* at 15.

An ICC meeting was held on June 23, 2011; Mr. Toscano declined to attend it. The next day, correctional officers moved him to B6-block rather than to the SNY. Mr. Toscano immediately informed C/O Bustamontes and two correctional officers that he could not be housed in the B6 block because he was an informant and had been targeted for assault/murder. *Id.* at 15. Officials refused to change his housing.

On June 27, 2011, Does 1-20 placed inmate Ramirez in Mr. Toscano's cell. Mr. Toscano told C/Os Bustamontes, Garza, Doe, Eberly that he "could not live with I/M Ramirez because he was an active gang member and plaintiff was protected custody (SNY)." *Id.* They didn't move Mr. Toscano. About an hour later, inmate Ramirez "attacked plaintiff with a deadly weapon as soon as he received orders from his fellow active Northern gang members that plaintiff was 'no good' and stabbed plaintiff on his left shoulder." *Id.* at 16. C/Os Eberly and Thompson beat Mr. Toscano with their batons and pepper-sprayed him. After they put him in restraints, they dropped him face first on the ground. *Id.* at 16. All this was done in retaliation because Mr. Toscano had told other prison officials that he "would testify against them if they were fabricating reports" about his debriefing. *Id.*

On August 31, 2011, an ICC meeting was held. Mr. Toscano was sent to the TPU-GP SNY the next day, pending his transfer to Kern Valley State Prison. *Id.* at 17.

He filed an inmate appeal on October 27, 2011 about the failure to protect him. He received unsatisfactory responses from defendants Smith and Bell. Nurse Serrano and Krisenheck issued a fabricated medical report about the attack by inmate Ramirez to aid a cover up. *Id.* at 17-18. Mr. Toscano received unsatisfactory responses as he pursued his inmate appeal. *Id.* at 18-19.

On December 9, 2011, Mr. Toscano was taken to a holding cell, where defendants Melton and Soderlund read him a CDC-114D notice and told him he was going to ad-seg because he "did not complete the debriefing process" and/or "the DRB did not review plaintiff's (SNY)

4

endorsement." *Id.* at 19.  They eventually said that Mr. Toscano would be taken off protective custody and placed in ad-seg if he did not withdraw his appeal.  *Id.* at 19.  He refused to withdraw the appeal.   Mr. Toscano repeated to captain Wilber that he refused to withdraw his inmate appeal; captain Wilber said, "okay, it's out of our hands now."  *Id.*  Mr. Toscano was then sent back to ad-seg.

On December 13, 2011, defendants B. Flowers and sergeant Evert tried to pressure him to go to the TPU in the SHU or he would be sent to a regular active general population line where he would be in danger.  Mr. Toscano declined.  *Id.* at 19-20.  Mr. Toscano filed unsuccessful inmate appeals.

At an ICC on December 14, 2011, the committee agreed to release Mr. Toscano back to TPU-GP SNY.  He was escorted back to the TPU the next day.  *Id.* at 20.

On December 31, 2011, sergeant Basso told Mr. Toscano he could withdraw his appeal or go back to ad-seg.  Mr. Toscano declined to withdraw his appeal.

On January 10, 2012, sergeant Doe gave Mr. Toscano a CDC-114D notice written by A. Pepiot and told Mr. Toscano he was going to be sent back to ad-seg.   Mr. Toscano filed an unsuccessful inmate appeal.  *Id.* at 21.

On January 18, 2012, Mr. Toscano appeared before an ICC committee, at which B. Flowers stated that they had received an email from CSR/Sacramento to put Mr. Toscano in ad-seg.  Prison officials disagreed among themselves about an appropriate placement, and eventually sent Mr. Toscano out of the ICC meeting so that prison officials could talk in private.  A few minutes later, Mr. Toscano was brought back to the ICC, at which point the prison officials were unfavorably disposed to him.  Mr. Toscano filed an unsuccessful inmate appeal.

On May 21, 2012, A. Perez issued another CDC-114D lock-up order authored by lieutenant G. Kelley, stating that Mr. Toscano would be kept in ad-seg and his case referred to the DRB.  This was an attempt to send him to the SHU in retaliation for exercising his First Amendment rights.  On May 23, 2012, Mr. Toscano appeared before an ICC comprised of defendants Perez, Still, Cruse, Bradbury and Does 1-10.  The ICC decided to retain him in ad-seg for 180 days "as a form of

1 punishment/retaliation and for (SHU) indeterminate placement to (DRB)." *Id.* at 24.  He filed
2 unsuccessful inmate appeals.  *Id.* at 24-26.

3 On October 22, 2012, C/O Juneau told Mr. Toscano he was scheduled for a DRB hearing,
4 and gave him chronos dated May 21, 2012 and July 25, 2012, that were written by A. Perez with
5 "fabricated statements."  *Id.* at 26.  Mr. Toscano declined to attend because the DRB refused to
6 accede to his demand for a recorded session.  DRB official Doe later told Mr. Toscano the DRB's
7 decision was to take him off protected custody SNY status and to transfer him to the Corcoran State
8 Prison SHU on an indeterminate status.  *Id.* at 27.

9 On January 17, 2013, Mr. Toscano received from C/O Juneau a report dated October 24,
10 2012 from DRB officials S. Hubbard, D. Speer, F. Schoening, B. Alkire, and M. Davis.  *See* Docket
11 # 12 (supplement to amended complaint).  The DRB had taken Mr. Toscano off protected custody
12 status and decided to transfer him to the SHU at Corcoran in retaliation and to endanger him.  In
13 May 2013, C/Os Resel and Turner picked up his property for inventory and transfer to Corcoran
14 State Prison.

### III.   DISCUSSION

A. <u>Review of Amended Complaint</u>

17 A federal court must engage in a preliminary screening of any case in which a prisoner seeks
18 redress from a governmental entity or officer or employee of a governmental entity.  *See* 28 U.S.C.
19 § 1915A(a).  In its review the court must identify any cognizable claims, and dismiss any claims
20 which are frivolous, malicious, fail to state a claim upon which relief may be granted, or seek
21 monetary relief from a defendant who is immune from such relief.  *See id.* at § 1915A(b).  *Pro*
22 *se* pleadings must be liberally construed.  *See Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699
23 (9th Cir. 1990).

24 To state a claim under 42 U.S.C. § 1983, a plaintiff must allege two elements:  (1) that a right
25 secured by the Constitution or laws of the United States was violated and (2) that the violation was
26 committed by a person acting under the color of state law.  *See West v. Atkins*, 487 U.S. 42, 48
27 (1988).

1. Non-Disclosure Of Confidential Information

The allegations based on the non-disclosure until 2010 of confidential information from 2002 and 2004 that Mr. Toscano was considered "no good" in a prison gang fail to state a claim under § 1983 for a due process violation. The procedural protections due an inmate in connection with an administrative decision to place him in restrictive housing such as the SHU do not include a right to disclosure of arguably favorable evidence. If an inmate is subjected to a deprivation of a liberty interest of real substance, due process requires that prison officials hold an informal nonadversary hearing within a reasonable time after the prisoner is segregated, inform the prisoner of the charges against him or the reasons segregation is being considered, and allow the prisoner to present his views. *See Sandin v. Conner*, 515 U.S. 472, 477-87 (1995); *Toussaint v. McCarthy*, 801 F.2d 1080, 1100 (9th Cir. 1986). Due process also requires that there be an evidentiary basis for the prison officials' decision to place an inmate in segregation for administrative reasons. *See Superintendent v. Hill*, 472 U.S. 445, 455 (1985); *Toussaint*, 801 F.2d at 1104-05. Prison officials are not constitutionally required to disclose to an inmate all evidence that might have a bearing on their administrative decisions. *Toussaint* sets the outer limits on that which is constitutionally required – concluding that "due process *only requires*" the informal nonadversary hearing, notice, and an opportunity to be heard, *Toussaint*, 801 F.2d at 1100 (emphasis added); neither *Toussaint* nor any other controlling case requires that prison officials disclose all potentially favorable evidence to the inmate. Similarly, the Due Process Clause does not require that prison officials disclose to the inmate arguably favorable information in connection with parole hearings. *Cf. Swarthout v. Cooke*, 131 S. Ct. 859, 862 (2011) (Supreme Court has identified only two procedural protections to which the prisoner is entitled under the Due Process Clause in connection with parole decision: an opportunity to be heard and a statement of the reasons why parole was denied).

The non-disclosure of the allegedly favorable information to Mr. Toscano also does not state a claim for retaliation. "Within the prison context, a viable claim of First Amendment retaliation entails five basic elements: (1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a

legitimate correctional goal." *Rhodes v. Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2005) (footnote omitted).  There is no chill on the exercise of First Amendment rights caused by an action of which the prisoner is not even aware.  Here, Mr. Toscano did not know until December 2010 that there were documents that said he was "no good" with a gang.  His First Amendment activities would not have been chilled by the existence of those documents he didn't know about, or by the fact that prison officials had not disclosed them to him.

The non-disclosure of the information also did not violate Mr. Toscano's Eighth Amendment rights. The Eighth Amendment requires that prison officials not be deliberately indifferent to a known risk to an prisoner's safety. *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994).  The fact that the alleged danger existed for nine years before Mr. Toscano was attacked suggests that the danger was not imminent or that prison officials did take steps (even if not disclosed to Mr. Toscano) that protected him from the alleged danger.  Further, if he actually was in danger, it was because a prison gang thought him "no good" rather than because he was not told of that fact.  (As explained in the next section, an Eighth Amendment claim *is* stated with regard to those defendants who allegedly ignored the information that Mr. Toscano was in danger.)

The amended complaint also does not state a § 1983 claim upon which relief may be granted against those defendants who allegedly improperly denied or improperly processed Mr. Toscano's inmate appeals about the nondisclosure.  The failure to grant an inmate's appeal in the prison administrative appeal system does not amount to a due process violation.  There is no federal constitutional right to a prison administrative appeal or grievance system for California inmates.  *See Ramirez v. Galaza*, 334 F.3d 850, 860 (9th Cir. 2003); *Mann v. Adams*, 855 F.2d 639, 640 (9th Cir. 1988); *Antonelli v. Sheahan*, 81 F.3d 1422, 1430 (7th Cir. 1996).  The denial of an inmate appeal is not so severe a change in condition as to implicate the Due Process Clause itself and the State of California has not created a protected interest in an administrative appeal system in its prison. California's regulations grant prisoners a purely procedural right: the right to have a prison appeal. *See* Cal. Code Regs. tit 15, §§ 3084 *et seq*.  A provision that merely provides procedural requirements, even if mandatory, cannot form the basis of a constitutionally cognizable liberty interest.  *See Smith v. Noonan*, 992 F.2d 987, 989 (9th Cir. 1993); *see also Antonelli*, 81 F.3d at 1430

(prison grievance procedure is procedural right that does not give rise to protected liberty interest requiring procedural protections of Due Process Clause). Mr. Toscano had no federal constitutional right to a properly functioning appeal system. Therefore, an incorrect decision on an administrative appeal or failure to process the appeal in a particular way did not amount to a violation of his right to due process.

### 2. Gang Validation

The allegations in the amended complaint about Mr. Toscano's validation as an associate of the NF prison gang fail to state a claim upon which relief may be granted. He alleges that false evidence was submitted but does not otherwise complain about the procedures in the gang validation process. False charges alone are not actionable under § 1983 because falsely accusing an inmate of misconduct does not violate a right secured by the Constitution or laws of the United States. If the false charge results in the deprivation of a protected liberty interest under *Sandin*, a § 1983 claim is not stated if the inmate is afforded the procedural protections required by federal law at the disciplinary or administrative hearing. *See Sprouse v. Babcock*, 870 F.2d 450, 452 (8th Cir. 1989); *Freeman v. Rideout*, 808 F.2d 949, 951 (2d Cir. 1986); *Hanrahan v. Lane*, 747 F.2d 1137, 1140-41 (7th Cir. 1984). Here, Mr. Toscano did not allege that he was deprived of any of the procedural protections to which he was entitled under *Toussaint* in the administrative proceedings to validate him as a gang associate and place him in ad-seg in 2007.[3] *See Allah v. State of California*, 1999 WL 273413 (9th Cir. 1999) ("the district court properly dismissed Allah's claims that two disciplinary reports filed against him by prison officials were based on false information because Allah received hearings on both reports") (*citing Freeman*, 808 F.2d at 951); *Byrd v. Parin*, 1995 WL 242248 (9th Cir. 1995) ("even if the defendants arbitrarily filed this disciplinary charge," plaintiff cannot recover under § 1983 because he received the procedural protections to which he was entitled) (citing *Freeman*, 808 F.2d at 951-52, and *Hanrahan*, 747 F.2d at 1141).

---

[3] It also is quite likely that the claim would be barred by the statute of limitations. The statute of limitations for a § 1983 action is two years, which may be extended with tolling of the limitations period for up to two years for the plaintiff's incarceration. *See Elliott v. City of Union City*, 25 F.3d 800, 802 (9th Cir. 1994); Cal. Civ. Proc. Code §§ 335.1, 352.1. The court need not reach the timeliness issue in light of the fact that the amended complaint fails to state a claim based on the 2007 validation.

9

Nor does the amended complaint assert a challenge to the sufficiency of the evidence to validate him as a gang associate in 2007. So long as there is "some evidence" to support the decision to put the inmate in administrative segregation, no constitutional claim for lack of evidence is stated. *See Toussaint*, 801 F.2d at 1104-05; *Bruce v. Ylst*, 351 F.3d 1283, 1287-88 (9th Cir. 2003).

### 3. Protective Custody and Safety Issues

<u>Deliberate Indifference To Safety</u>: The Eighth Amendment's prohibition on cruel and unusual punishment requires that prison officials not be deliberately indifferent to a known risk to an prisoner's safety. *See Farmer*, 511 U.S. at 834. In particular, prison officials have a duty to protect prisoners from violence at the hands of other prisoners. *Id.* at 833; *Hearns v. Terhune*, 413 F.3d 1036, 1040 (9th Cir. 2005). Liberally construed, the amended complaint states several § 1983 claims against the following defendants for deliberate indifference to Mr. Toscano's safety.

A claim is stated against defendants Lewis, Barneburg, Ruff, Schoening, Rothchild, and Kennedy for releasing Mr. Toscano from the SHU on March 28, 2011, while knowing he "was targeted for assault/murder." Docket # 8-1, p. 13.

A claim is stated against defendant Basso for his acts on and after April 15, 2011 that caused Mr. Toscano not to be sent to the TPU-GP for SNY.

A claim is stated against defendants Bustamontes, Garza, and Eberly for their actions on June 23-27, 2011 that caused Mr. Toscano to be moved to a housing unit other than the SNY and to be placed in a cell with an active gang member.

A claim is stated against defendants Melton, Soderlund, Wilber, Flowers, Evert, Basso, Pepiot, Perez, Kelley, Still, Cruse, and Bradbury for their refusals to put him in the SNY, as mentioned in pages 17-27 of the amended complaint.

A claim is stated against defendants Hubbard, Speer, Schoening, Alkire, and Davis for their role in the DRB proceedings and report that caused Mr. Toscano to be taken off protective custody

status and transferred to the SHU at Corcoran.[4]  *See* Docket # 12 (supplement to amended complaint).

A claim is *not* stated against defendants Webster, Strain and Bell for their alleged activities in April 2011, because the allegations show their actions were taken to increase Mr. Toscano's protection rather than to expose him to an inmate attack.

A claim is *not* stated against defendant Clower for making statements that other inmates could hear on June 21, 2011, because nothing he did altered Mr. Toscano's situation.  Although Mr. Toscano alleges that Clower made statements that others could hear that endangered Mr. Toscano, Mr. Toscano was already in danger because he had provided information in April 2011 that he contends caused him to become known as an informant.  *See* Docket # 8-1, p. 14 (the April 8, 2011 searches of Northern inmates' cells made "it obvious that plaintiff provided information against them, which plaintiff did not care because plaintiff was 'locking it up' and told them I'm going to (SNY)").

A claim is *not* stated against defendant Juneau for giving him chronos written by another prison official on October 22, 2012.

A claim is not stated against nurses Serrano and Krisenheck, who allegedly issued a fabricated medical report about the attack by inmate Ramirez.

Excessive Force:  The Eighth Amendment's prohibition of cruel and unusual punishments protects an inmate from force used maliciously and sadistically for the very purpose of causing harm.  *See generally Hudson v. McMillian*, 503 U.S. 1, 6 (1992).  Liberally construed, the amended complaint states a § 1983 claim against defendants Eberly and Thompson for their alleged use of excessive force on Mr. Toscano on June 27, 2011.

Retaliation: Giving the amended complaint the liberal construction to which it is entitled, a claim is stated against the following defendants for retaliating against Mr. Toscano for the exercise of his First Amendment activities:  Basso, Clower, Bustamontes, Garza, Eberly, Thompson, Melton,

---

[4] Three other correctional officers are mentioned in the supplement to the amended complaint.  A claim is not stated against C/O Juneau, who allegedly handed Toscano the DRB report.  A claim is not stated against C/O Resel and C/O Turner, who aided his packing and departure pursuant to the DRB's transfer decision.

Soderlund, Wilber, Flowers, Evert, Flowers, Perez, Kelley, Still, Cruse, Bradbury, Hubbard, Speer, Schoening, Alkire, and Davis. *See Rhodes*, 408 F.3d at 568 (internal citation ommitted) ("Speech can be chilled even when not completely silenced. . . [T]he proper First Amendment inquiry is "'whether an official's acts would chill *or* silence a person of ordinary firmness from future First Amendment activities.'").

Administrative Appeals: As mentioned above, the failure to grant or properly handle an administrative appeal does not give rise to a claim for a violation of the inmate's due process rights. Although there is no due process violation, the handling of Mr. Toscano's appeals may be relevant to his other claims. If a defendant only denied an inmate appeal about a problem that already had occurred and was complete (*e.g.*, an appeal about the inmate attack after it occurred), there would be no liability for a constitutional violation; however, where the problem is an ongoing constitutional violation and the request is made in an inmate appeal to remedy the ongoing problem, liability can be based on the denial of an inmate appeal, just as it could be based on the denial of a verbal request from the inmate. *Cf. Jett v. Penner*, 439 F.3d 1091, 1098 (9th Cir. 2006) (supervisor may be liable for deliberate indifference to a serious medical need, for instance, if he or she fails to respond to a prisoner's request for help).

Exclusion From Part of Classification Hearing: Mr. Toscano alleges that his exclusion from part of the January 18, 2012 ICC committee meeting denied him his "right to speak, to be present, [and to] . . notice of new charge." Docket # 8-1, p. 22. On the facts alleged, no claim is stated for due process violation because Mr. Toscano was excused from the committee meeting only temporarily, and was present for the portions of the hearing before and after that limited exclusion. *Id.* Mr. Toscano received the required procedural protections: he had received a CDC-114D notice on January 10, 2012, *see id.* at 21, that would have told him the reasons segregated housing was being considered; he had a hearing; and he had an opportunity to present his views at the hearing. *See Toussaint*, 801 F.2d at 1100.

### 4. The Doe Defendant Problem

The use of "Jane Doe" or "John Doe" to identify a defendant is not favored in the Ninth Circuit, *see Gillespie v. Civiletti*, 629 F.2d 637, 642 (9th Cir. 1980), but sometimes is necessary

when a plaintiff cannot discover the identity of the defendant before filing the complaint. Although the use of a Doe defendant designation is acceptable to withstand dismissal of a complaint at the initial review stage, using a Doe defendant designation creates its own problem: that person cannot be served with process until he or she is identified by his or her real name. Mr. Toscano must take steps promptly to discover the full name (*i.e.*, first and last name) of each of the John Doe defendants and provide that information to the Court in his amended complaint. The burden remains on the plaintiff; the Court will not undertake to investigate the names and identities of unnamed defendants.

Here, there is an additional problem with the Doe defendants. It cannot be determined whether most of the Doe defendant references are to a single exceptionally busy person or to several different persons – the confusion exists because Mr. Toscano calls any and all persons he doesn't know "Doe defendant." A plaintiff may use Doe defendant designations to refer to defendants whose names are unknown to plaintiff; however, he must number them, *e.g.*, John Doe #1, John Doe # 2, etc. so that each numbered John Doe refers to a different person.

The Court will not require a second amended complaint so that Mr. Toscano can sort out his many Doe defendants because that likely would make the situation even more confusing. The amended complaint covers several years of activities that involved many prison officials. (Even without the Doe defendants, there are 70+ named defendants. *See* Docket # 8-1, pp. 4-6.) The better course is to allow Mr. Toscano to file an amendment to provide a true name for a Doe defendant and at that time identify the person by reference to the specific paragraph(s) in which every allegation against that person appears. Thus, if he learned that Mickey Mantle was the person who came to his cell on April 15, 2011, he could file an amendment to his amended complaint that states: "I amend to substitute Mickey Mantle in place of the Doe defendant mentioned in paragraph 106 of the amended complaint." That amendment would have to identify each and every paragraph in which Mickey Mantle was the person referred to as a Doe defendant.

Mr. Toscano does not have an open-ended opportunity to file amendments naming Doe defendants. Any Doe defendant whose true name and identity has not been provided to the Court by

13

1 Mr. Toscano by the date scheduled in this order for defendants to file their dispositive motion will
2 be dismissed without prejudice to Mr. Toscano filing a new action against such a person.

3 B.     Miscellaneous Matters

4 Mr. Toscano's motion to amend that was attached to the proposed amended complaint is
5 GRANTED. (Docket # 8.) The amended complaint has been permitted and is now the operative
6 pleading.

7 Mr. Toscano has requested that counsel be appointed to represent him in this action. A
8 district court has the discretion under 28 U.S.C. §1915(e)(1) to designate counsel to represent an
9 indigent civil litigant in exceptional circumstances. *See Wilborn v. Escalderon*, 789 F.2d 1328, 1331
10 (9th Cir. 1986). This requires an evaluation of both the likelihood of success on the merits and the
11 ability of the plaintiff to articulate his claims *pro se* in light of the complexity of the legal issues
12 involved. *See id.* Neither of these factors is dispositive and both must be viewed together before
13 deciding on a request for counsel under § 1915(e)(1). Here, exceptional circumstances requiring the
14 appointment of counsel are not evident at this time. The requests for appointment of counsel are
15 DENIED.  (Docket # 9, # 16.)

16 Mr. Toscano filed a motion ordering prison officials to issue him all of his paperwork, books
17 and property. (Docket # 14.) This relief is sought against non-parties to this action because Mr.
18 Toscano has been moved to a new prison. Absent unusual and compelling circumstances not present
19 here, federal courts generally are discouraged from interfering with day-to-day prison administration
20 decisions. *See Turner v. Safley*, 482 U.S. 78, 84-86 (1987); *Wright v. Rushen*, 642 F.2d 1129, 1132
21 (9th Cir. 1981) (courts should avoid enmeshing themselves in minutiae of prison operations in name
22 of constitution); *see generally Lewis v. Casey*, 518 U.S. 343, 354 (1996) (constitutional right of
23 access to the courts is limited to the initiation of a court action; the state is not required to enable
24 prisoners to litigate effectively once in court). An order giving plaintiff all of the property he
25 requests would be particularly intrusive into prison operations because he is housed in the SHU,
26 where prison officials by design greatly restrict inmates' privileges and property. Moreover, the
27 relief is sought against nonparties. The motion for Corcoran State Prison officials to issue Mr.
28 Toscano his property is DENIED. (Docket # 14.) If Mr. Toscano wishes to seek court relief for the

1  deprivation of his property, he may file a civil action in the Kings County Superior Court or in the
2  U.S. District Court for the Eastern District of California, as those are proper venues for claims about
3  conditions at Corcoran State Prison.

4      Mr. Toscano's "motion for immediate transfer out of CDC prison system to a federal prison"
5  is DENIED. (Docket # 17.) This motion seeks a transfer to an entirely different prison system
6  because Mr. Toscano's property was disposed of without his consent at Corcoran State Prison. As
7  explained in the preceding paragraph, Mr. Toscano may file a civil action in the Kings County
8  Superior Court or in the U.S. District Court for the Eastern District of California to complain about
9  conditions at Corcoran State Prison.

## IV.  CONCLUSION

11      1.    The amended complaint states cognizable § 1983 claims against defendants Lewis,
12  Barneburg, Ruff, Schoening, Rothchild, Kennedy, Basso, Bustamontes, Garza, Eberly, Melton,
13  Soderlund, Wilber, Flowers, Evert, Pepiot, Perez, Kelley, Still, Cruse, Bradbury, Hubbard, Speer,
14  Schoening, Alkire, Davis, Clower, and Thompson. All other named defendants are dismissed.

15      2.    The Clerk shall issue a summons and the United States Marshal shall serve, without
16  prepayment of fees, the summons, a copy of the amended complaint and a copy of all the documents
17  in the case file upon the following defendants, who apparently work at Pelican Bay State Prison,
18  except as otherwise noted:

- G.D. Lewis (warden)
- D.W. Bradbury (associate warden)
- K. R. Cruse (correctional captain)
- G. Kelley (correctional lieutenant)
- D. Barneburg (correctional lieutenant)
- A. Pepiot (correctional lieutenant)
- Evert (correctional sergeant)
- Basso (correctional sergeant)
- Bustamontes (correctional officer)
- Garza (correctional officer)
- G. Eberly (correctional officer)
- D. Thompson (correctional officer)
- D. Melton (correctional counselor)
- Soderlund (correctional counselor)
- Wilber (correctional captain)
- T. Still (correctional counselor)
- B. Flowers (correctional counselor)
- R. Clower (correctional counselor)
- A. Perez (correctional counselor)

- P. Kennedy (correctional counselor)
- B. Alkire (classification staff representative)
- F. Schoening (psychologist)
- Tanya Rothchild (chief officer for classification service unit)
- S. Hubbard (CDCR Departmental Review Board in Sacramento)
- D. Speer (CDCR Departmental Review Board in Sacramento)
- M. Davis (CDCR Departmental Review Board in Sacramento)
- M. Ruff (special agent in Office of Correctional Safety at CDCR in Sacramento)

3. In order to expedite the resolution of this case, the following briefing schedule for dispositive motions is set:

a. No later than **July 19, 2013**, defendants must file and serve a motion for summary judgment or other dispositive motion. If defendants are of the opinion that this case cannot be resolved by summary judgment, defendants must so inform the Court prior to the date the motion is due. If defendants file a motion for summary judgment, defendants must provide to plaintiff a new *Rand* notice regarding summary judgment procedures at the time they file such a motion. *See Woods v. Carey*, 684 F.3d 934, 939 (9th Cir. 2012). If defendants file a motion to dismiss for non-exhaustion of administrative remedies, defendants must provide to plaintiff a notice regarding motions to dismiss for non-exhaustion procedures at the time they file such a motion. *See Stratton v. Buck*, 697 F.3d 1004, 1008 (9th Cir. 2012).

b. Plaintiff's opposition to the summary judgment or other dispositive motion must be filed with the Court and served upon defendants no later than **August 16, 2013**. Plaintiff must bear in mind the notice and warning regarding summary judgment provided later in this order as he prepares his opposition to any motion for summary judgment. Plaintiff also must bear in mind the notice and warning regarding motions to dismiss for non-exhaustion provided later in this order as he prepares his opposition to any motion to dismiss.

c. If defendants wish to file a reply brief, the reply brief must be filed and served no later than **August 30, 2013**.

4. Plaintiff is provided the following notices and warnings about the procedures for motions for summary judgment and motions to dismiss for non-exhaustion of administrative remedies:

16

> The defendants may make a motion for summary judgment by which they seek to have your case dismissed. A motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure will, if granted, end your case. . . . Rule 56 tells you what you must do in order to oppose a motion for summary judgment. Generally, summary judgment must be granted when there is no genuine issue of material fact -- that is, if there is no real dispute about any fact that would affect the result of your case, the party who asked for summary judgment is entitled to judgment as a matter of law, which will end your case. When a party you are suing makes a motion for summary judgment that is properly supported by declarations (or other sworn testimony), you cannot simply rely on what your complaint says. Instead, you must set out specific facts in declarations, depositions, answers to interrogatories, or authenticated documents, as provided in Rule 56(e), that contradict the facts shown in the defendants' declarations and documents and show that there is a genuine issue of material fact for trial. If you do not submit your own evidence in opposition, summary judgment, if appropriate, may be entered against you. If summary judgment is granted, your case will be dismissed and there will be no trial. *Rand v. Rowland*, 154 F.3d 952, 962-63 (9th Cir. 1998).
>
> The defendants may file a motion to dismiss for failure to exhaust administrative remedies instead of, or in addition to, a motion for summary judgment. A motion to dismiss for failure to exhaust administrative remedies is similar to a motion for summary judgment in that the court will consider materials beyond the pleadings. You have the right to present any evidence you may have which tends to show that you did exhaust your administrative remedies or were excused from doing so. The evidence may be in the form of declarations (that is, statements of fact signed under penalty of perjury) or authenticated documents (that is, documents accompanied by a declaration showing where they came from and why they are authentic), or discovery documents such as answers to interrogatories or depositions. In considering a motion to dismiss for failure to exhaust, the court can decide disputed issues of fact with regard to this portion of the case. If defendants file a motion to dismiss and it is granted, your case will be dismissed and there will be no trial. *See generally Stratton v. Buck*, 697 F.3d at 1008.

5.   All communications by plaintiff with the Court must be served on a defendant's counsel by mailing a true copy of the document to defendant's counsel. The Court may disregard any document which a party files but fails to send a copy of to his opponent. Until a defendant's counsel has been designated, plaintiff may mail a true copy of the document directly to defendant, but once a defendant is represented by counsel, all documents must be mailed to counsel rather than directly to that defendant.

6. Discovery may be taken in accordance with the Federal Rules of Civil Procedure. No further court order under Federal Rule of Civil Procedure 30(a)(2) or Local Rule 16 is required before the parties may conduct discovery.

7. Plaintiff is responsible for prosecuting this case. Plaintiff must promptly keep the Court informed of any change of address and must comply with the Court's orders in a timely fashion. Failure to do so may result in the dismissal of this action for failure to prosecute pursuant to Federal Rule of Civil Procedure 41(b). Plaintiff must file a notice of change of address in every pending case every time he is moved to a new facility.

8. Plaintiff is cautioned that he must include the case name and case number for this case on any document he submits to the Court for consideration in this case.

IT IS SO ORDERED.

Dated: April 16, 2013

_____
EDWARD M. CHEN
United States District Judge