**United States District Court**
For the Northern District of California

1
2
3
4
5                          UNITED STATES DISTRICT COURT
6                          NORTHERN DISTRICT OF CALIFORNIA
7
8   BENJAMIN K. TOSCANO,                      No. C-12-5893 EMC (pr)
9            Plaintiff,
                                             **ORDER GRANTING IN PART AND**
10       v.                                   **DENYING IN PART DEFENDANTS'**
                                             **MOTION FOR SUMMARY JUDGMENT**
11  G. LEWIS; *et al.*,
                                             **(Docket No. 188)**
12           Defendants.
    _____/
13
14
15                    **I.    INTRODUCTION**
16       This *pro se* prisoner's civil rights action is now before the Court for consideration of a
17  defense motion for summary judgment.  For the reasons discussed below, the motion will be denied
18  in part and granted in part.  Specifically, the motion for summary judgment will be denied as to the
19  claim that Defendants Eberly and Thompson used excessive force on Plaintiff, and granted in all
20  other respects.
21                    **II.   BACKGROUND**
22  A.   Procedural History
23       In the order of service and partial dismissal (Docket # 19), the Court determined that Mr.
24  Toscano had stated a claim upon which relief may be granted for the following events and
25  omissions.  First, the Court found the following cognizable deliberate indifference to safety claims:
26  (a) against defendants Lewis, Barneburg, Ruff, Schoening, Rothchild, and Kennedy for releasing
27  Mr. Toscano from the security housing unit to general population on March 28, 2011; (b) against
28  defendant Basso for his acts on and after April 15, 2011 that caused Mr. Toscano not to be sent to a

sensitive needs yard (SNY); (c) against defendants Bustamante, Garza, Eberly and Thompson for their actions on June 23 through 27, 2011 that caused Mr. Toscano to be moved to a housing unit other than the SNY and to be placed in a cell with Ramirez; (d) against Defendants Melton, Soderlund, Wilber, Flowers, Evert, Basso, Pepiot, Perez, Kelley, Still, Cruse, and Bradbury for their refusals to put him in the SNY; and (e) against Defendants Hubbard, Speer, Schoening, Alkire, and Davis for their role in the DRB proceedings and that caused Mr. Toscano to be transferred to the security housing unit at Corcoran.  Second, the Court found a cognizable claim for the use of excessive force by Defendants Eberly and Thompson on June 27, 2011.  Third, the Court found cognizable retaliation claims against Defendants Basso, Clower, Bustamante, Garza, Eberly, Thompson, Melton, Soderlund, Wilber, Flowers, Evert, Perez, Kelley, Still, Cruse, Bradbury, Hubbard, Speer, Schoening, Alkire, and Davis.  The Court dismissed several other claims for the reasons stated in the order of service and partial dismissal.

B.      Statement of Facts[1]

        The events and omissions giving rise to this action occurred from February 2011 through October 2012 ("the relevant time").  Mr. Toscano had been in the Pelican Bay State Prison security housing unit (SHU) for many years after having been validated as an associate of the Northern Structure prison gang.  This action is based on events and omissions occurring after he was

---

        [1]  This order runneth over with acronyms.  Here, in one place, they are:

| | |
|---|---|
| Ad-seg | administrative segregation |
| C/C | correctional counselor |
| CDCR-114D | Notice of placement in administrative housing form |
| CDCR-128 | a memorandum, also known as a chrono |
| CDCR-602 | an inmate appeal form |
| CDCR-1030 | a confidential information disclosure form |
| C/O | correctional officer |
| CSR | Classification Staff Representative |
| DRB | Department Review Board |
| GP | general population |
| ICC | Institutional Classification Committee |
| OCS | Office of Correctional Safety |
| PBSP | Pelican Bay State Prison |
| SHU | Security Housing Unit |
| SNY | Sensitive Needs Yard |
| THU | Transitional Housing Unit at Kern Valley |
| TPU | Transitional Program Unit at Pelican Bay |

determined in 2010 to be an *inactive* gang associate and was released from the Pelican Bay SHU. Before describing the lengthy series of events for Mr. Toscano's case, it is necessary to provide several pages of background information about prison operations, including some information about Hispanic gangs, the categorization and procedures for handling gang members and associates (collectively called "gang affiliates") and some special housing units.

The following facts are undisputed unless otherwise noted:

1.    Gang Affiliates, Inactive Inmates and Debriefing

"Prison gang activity poses one of the greatest threats to institutional security in California prisons."  Docket # 189 (Barneburg Decl.) at 7.  Barneburg described the Hispanic gangs and their connection to the non-gang Hispanic prison population:

> [T]here are two major Hispanic prison gangs, the Mexican Mafia and the Nuestra Familia.  The Nuestra Familia also has close ties to a third Hispanic prison gang, the Northern Structure (also called Nuestra Raza).  The Northern Structure grew out of the Nuestra Familia and is subservient to the Nuestra Familia.  The Northern Structure and its members and associates are responsible for carrying out criminal activities for the Nuestra Familia.  Nuestra Familia members are often pulled from the ranks of the Northern Structure.  These two factions (the Mexican Mafia/Southerners and the Nuestra Familia/Northern Structure/Northerners) are enemies and cycle between periods of violence and peace on the general population, depending on direction from the gang's hierarchy.'

> In prison, all Hispanic inmates are expected by Hispanic prison gangs to identify as a "Southerner" or a "Northerner," *even if those inmates are not involved in gang activity.*  During an incident such as a prison riot, Northerners are expected to assist other Northerners and the Nuestra Familia/Northern Structure and fight against Southerners and the Mexican Mafia.  Similarly, Southerners are expected to assist other Southerners or affiliates of the Mexican Mafia against Northerners, the Nuestra Familia, and the Northern Structure. [¶] "Sureno" is the term for a Southern Hispanic street gang member, and "Norteno" is the term for a Northern Hispanic street gang member.  In Spanish, these words mean "Southerner" and "Northerner."  Hispanic street gangs in California identify as either Southern or Northern.  This distinction arose in the late 1960s in California prisons, when Hispanic inmates from the Los Angeles area came into conflict with Hispanic inmates from Northern California rural areas.

**United States District Court**
For the Northern District of California

3

1   Docket # 189 at 8 (emphasis added).[2]

2          Active gang affiliates, inactive gang affiliates and gang dropouts are three different types of

3   inmates and are treated differently.  The term "gang affiliates" refers to gang members as well as

4   gang associates.  Docket # 189 at 7.[3]  The California Department of Corrections and Rehabilitation

5   (CDCR) has procedures to house gang members and associates in the SHU.  The process of

6   determining whether an inmate should be placed in the SHU includes "validating" him as a gang

7   member or associate.  *See* Cal. Code Regs. tit. 15, § 3378(c)(6) (2011).  The CDCR also has

8   procedures to consider for release from the SHU inmates who are no longer active in a prison gang.

9   The process of determining whether the inmate is no longer active includes validating him as an

10  "inactive" gang member or associate.  *See id.* at § 3378(d), (e), and (g) (2011).  The CDCR also has

11  a procedure for determining that an active or inactive gang member or associate has further

12  distanced himself from the gang by debriefing and becoming a gang dropout.  *See id.* at §

13  3341.5(c)(4), § 3378(c)(5) (2011).

14

15

16  _____

17       [2]  Mr. Toscano has a different interpretation of the Hispanic prison population, as well as his
    status and that of Mr. Ramirez, who was his cellmate for a few hours.  Mr. Toscano states that Mr.
18  Ramirez "was an active gang member.  (*All Northern Hispanic Inmates* functioning/programming
    on G.P./Ad-seg/SHU's, are active gang members of the northern gang.) . . . [S]ince CDC started to
19  use the term 'inactive,' *active inmates* will ask you, if your *active* or *not*, if you say your *not*, you
    become a target for assault/murder by the active inmates who are still actively functioning as a
20  group."  Docket # 226 at 1-2 (emphasis, parentheses, grammatical errors and spelling errors in
    original); *see also* Docket # 227 at 96-97 (Rios Decl. describing "Northern Structure" as a
21  misnomer); Docket # 222 at 2.  Mr. Toscano has not demonstrated that he has personal knowledge
    of the alleged facts to which he asserts, i.e., he shows no foundation for his opinion that Mr. Ramirez
22  was an active gang member, or that all Northern Hispanic inmates "functioning/programming" –
    whatever that term means – are active gang members, or that there is a "northern gang."  More
23  importantly, the inmate's view of how gangs work and how inmate factions align does not speak to
    how prison officials viewed prison gangs and inmate factions.
24
         Mr. Toscano has failed to show a triable issue that Mr. Ramirez was an active gang member
25  in a prison gang, that all Northern Hispanic inmates are in a gang, or that there is a prison gang
    called the "northern gang."
26
         [3]  "A member is an inmate/parolee or any person who has been accepted into membership by
27  a gang."  Cal. Code Regs. tit. 15 § 3378(c)(3) (2011).  "An associate is an inmate/parolee or any
    person who is involved periodically or regularly with members or associates of a gang."  *Id.* at §
28  3378(c)(4).  *See also* Docket # 189 at 8.  None of Plaintiff's claims are based on any difference in
    the treatment of the two groups.

**United States District Court**
For the Northern District of California

1    Being validated as *inactive* in a gang is not the same as being deemed a *dropout* from a gang.

2    Inmates whom the Office of Correctional Safety (OCS) "validates as inactive gang associates or

3    members are released to the general population.  They are not automatically sent to a sensitive needs

4    yard.  The regulation generally calls for inactive gang affiliates to be sent to general population in a

5    Level IV facility upon release from the SHU.  *See* Cal. Code Regs. tit. 15 § 3341.5(c)(5) (2011)

6    ("Inmates categorized as inactive who are suitable for SHU release shall be transferred to the general

7    population of a Level IV facility for a period of observation that shall be no greater than 12

8    months."); *see also* Docket # 227-3 at 55 ("Notice of Conditions of Inactive Validation" form states,

9    "Based on your newly designated inactive status, the DRB may elect to conditionally release you

10   from a Security Housing Unit (SHU) to a general population facility," and then describes behavioral

11   expectations for inmate).

12   To be housed in a sensitive needs yard, the validated inactive gang associate must complete

13   the debriefing process.  *See* Docket # 194 (Basso Decl.) at 5.  "The debriefing program is a lengthy

14   process that consists of two phases (assessment/interview and observation)" that can take up to two

15   years to complete.  Docket # 189 at 10.  During the first phase, the Institutional Gang Investigator

16   interviews the inmate and determines whether he is sincere in his desire to dissociate from a gang

17   and not trying to gain access to an SNY to attack inmates who have debriefed.  *Id.* at 10-11.  The

18   inmate then is asked to write an autobiography about gang activity.  *Id.* at 11.  Once the assessment

19   is complete, an OCS agent reviews the autobiography, identifies areas for follow-up, and does an in-

20   depth interview of the inmate that may last several days.  *Id.* at 11.  The OCS agent then assembles a

21   debriefing report (which may be over 200 pages long), which the inmate must review for accuracy

22   and sign.  *Id.*  During the second phase of the debriefing process, the inmate is housed at the

23   Transitional Housing Unit at Kern Valley State Prison, where he is observed.  Inmates who

24   successfully complete both phases of the debriefing program are then validated as gang "dropouts"

25   by the OCS.  *Id.*; *see also* Cal. Code Regs. tit. 15 § 3378.1 (2011) (describing debriefing process).

26        2.    Housing Units

27   There are several kinds of special housing units in the California prison system.  Docket #

28   192 (Soderlund Decl.) at 2.  Most important to the present dispute is the sensitive needs yard

United States District Court
For the Northern District of California

1   ("SNY"). An SNY is a yard reserved for inmates who have specific, verified safety concerns, and

2   for inmates who have completed the gang debriefing process and are in need of protective housing.

3   *Id.* The Protective Housing Unit (PHU) mentioned in Title 15 § 3341.5 of the California Code of

4   Regulations, as it existed in 2011, describes an SNY. *See* Docket # 192 at 2.

5          The Transitional Program Unit ("TPU") is a housing unit at Pelican Bay in which inmates

6   who have been endorsed for housing in an SNY are housed while they await transfer to a prison with

7   an SNY. The TPU houses gang debriefers, and also may house inmates with high notoriety, specific

8   safety concerns, sex offenses (especially against children), or other factors that require placement in

9   a sensitive needs yard. *Id.* Pelican Bay's TPU has the same program as an SNY, and the inmates in

10  both the TPU and SNY have the same routine and privileges they would have in general population.

11  (The TPU is different from the Transitional Housing Unit (THU), which is located only at Kern

12  Valley State Prison and used for inmates in the final phase of the gang debriefing program, i.e.,

13  inmates who have repudiated their gang affiliation. *Id.*)

14         Inactive gang members and associates who have not debriefed and have not been designated

15  as gang dropouts generally cannot be placed in an SNY. On February 14, 2012, a memorandum was

16  issued by the director of the CDCR's Division of Adult Institutions regarding SNY placement

17  consideration for validated prison gang dropouts that "reaffirm[ed] the direction provided" in a

18  February 19, 2002 memorandum." Docket # 192-1. "Specifically, inmates validated as active or

19  inactive prison gang members or associates by the Office of Correctional Safety (OCS) are ineligible

20  for SNY placement. Only those validated inmates whose status has been changed to "dropout" by

21  OCS may be considered for SNY placement." Docket # 192-1 at 2. Soderlund explained the

22  importance of this policy mentioned in the February 14, 2012 memorandum:

23         This policy is essential to safeguard inmates housed in sensitive needs
           yards, including debriefers, inmates who have committed sex crimes,
24         and high notoriety inmates. Defendants have to ensure that inmates
           who are housed in these yards will not commit violent acts upon other
25         inmates, are sincere in their desire to refrain from gang activity, and
           are willing to program. [¶] As CDCR memoranda recognize, there is a
26         very real danger that "sleeper" inmates who are still participating in
           gang activity will try to gain access to sensitive needs yards to carry
27         out assaults on debriefers on behalf of prison gangs. Gangs consider
           debriefers to be "snitches." CDCR must ensure that "sleeper" inmates

28

United States District Court
For the Northern District of California

1  do not get transferred to sensitive needs yards, because they will harm
2  if not kill inmates there who have debriefed.

3  Docket # 192 at 4-5.

4  Pelican Bay has an operating procedure regarding double-celling that requires inmates to

5  accept inmate housing assignments as directed by staff and states the expectation that all inmates

6  will be double-celled. *Id.* at 6. An inmate may be subject to disciplinary action for refusing a lawful

7  order to double-cell. *Id.* Pelican Bay also uses a form entitled "Involuntary Double Celling," which

8  is "filled out by a lieutenant when inmates are involuntarily double-celled, after the inmates have

9  been unsuccessful in finding a compatible cellmate." *Id.* According to Soderlund, the double-

10 celling form is not completed every time an inmate is given a cellmate, however, and often new

11 inmates arriving at Pelican Bay from a reception center will be double-celled with other general

12 population inmates without either inmate approving of the double-celling. *Id.* at 6. Mr. Toscano has

13 not shown that he has any personal knowledge to support his conclusory assertion that the double-

14 celling form is uniformly used when inmates are double-celled. In fact, Mr. Toscano had not even

15 been put in a double cell for about a decade, and therefore had no recent experience on which to

16 base his assertion.

17 Inmates can request new cellmates for a variety of reasons, such as an age difference

18 between cellmates, the cellmates dislike each other, one cellmate has canteen money and the other

19 does not, or an inmate wants to move to facilitate getting a new inmate-created tattoo. Docket # 197

20 at 4. Some officers will not move inmates to new cells simply for these kinds of "convenience

21 moves" or "accommodation moves." *Id.* Inmates also can seek to change cells for safety reasons.

22 And inmates also can seek to change cells for more nefarious reasons, such as to accomplish tasks

23 for a gang. *Id.* Inmates also can seek to change cells for safety reasons.

24 3.  Mr. Toscano

25 Mr. Toscano had been housed in the SHU since 2000 due to his validation as an associate of

26 the Northern Structure prison gang. In late 2010, the OCS validated Mr. Toscano as an inactive

27 gang associate. Docket # 20 (First Amended Complaint) at 13. To prison officials, that meant that

28 Mr. Toscano once had been an active associate of the Northern Structure and that the OCS

United States District Court

For the Northern District of California

1    designated him as inactive in 2010 because there was no evidence that he had participated in any

2    gang activity for the last six years.  Mr. Toscano and inmates like him are referred to as validated

3    inactive gang associates.  Docket # 189 at 9.

4         Mr. Toscano has not debriefed and has not been designated as a gang dropout.  *Id.* at 10; *see*

5    *also* Cal. Code Regs. tit. 15 § 3378.1 (2011) (describing debriefing process).

6         4.    <u>Housing Leading Up To The Fight With Mr. Ramirez</u>

7         After Mr. Toscano was validated as an inactive gang associate in late 2010, the DRB

8    reviewed Mr. Toscano's case on February 10, 2011 and decided to release him from the SHU and

9    approved his transfer to Pelican Bay's Level IV general population.  *See* Docket # 199-3 at 27-28.

10   Mr. Toscano refused to attend the DRB hearing.  *Id.* at 28.  The DRB's February 10, 2011 memo

11   noted the following about potential safety concerns based on a couple of old documents:

12            • [O]ne confidential memorandum and one confidential CDCR 128-B
             were discovered, which indicated Inmate Toscano may have safety
13           concerns with the NS/Nuestra Familia (NF).  A confidential CDCR
             128-B dated 8-06-02, indicated a mini note was discovered that
14           identified Inmate Toscano was targeted for assault.  The author of this
             mini note was unknown.  However, the CDCR 128-B went on and
15           clarified that recent intercepted confidential information between a
             validated NS member and a validated NF member verified Inmate
16           Toscano was on good terms with the NS/NF prison gangs.  A
             confidential memorandum dated 5-24-04, indicated Inmate Toscano
17           was sharing NF material without authority and that this behavior could
             target him for reprisal from the NS/NF.  However, it did not say he
18           was targeted for assault.  There is no current information in Inmate
             Toscano's central file that places him on any 'hit list' or shows he is
19           targeted for assault. CDCR 1030s[4] were issued to Inmate Toscano for
             the two confidential documents.

20

21            • On 12-02-10, PBSP staff interviewed Inmate Mr. Toscano regarding
             possible safety concerns.  He stated that was "old news," and he would
22           have no problems programming on a GP facility.  The custody staff
             also indicated he has no problems with other NS members or
23           associates in his housing unit.

24

25
     _____

26       [4]  A CDCR-1030 summarily describes confidential information that has been obtained by
     prison officials and is used by prison officials to let the prisoner know that something from a
27   confidential source has been used in a decision about him; the form states why it is considered
     reliable information, and describes the item in general terms without identifying, for example, the
28   name of the inmate-informant.

                                         8

United States District Court
For the Northern District of California

1  Docket # 199-3 at 27.  The DRB memo also noted that the classification services unit had noted that

2  "Toscano's safety concerns seem to have been resolved and would not preclude his release to the

3  GP, noting positive programming with other NS inmates."  *Id.* at 28.  The DRB memo also noted

4  Mr. Toscano's lengthy (albeit old) disciplinary history involving violence and weapons.  *Id.*[5]

5        By the time he was being considered for release from the SHU, Mr. Toscano had long

6  believed that he was on a no-good list.  In his deposition, Mr. Toscano stated that he was put on a

7  no-good list in 2002 by the Northern Structure prison gang because he cut his ties with the gang and

8  said he would do his own program.  *See* RT 42, 79-80; *see also* Docket # 220 at 8.  After that, the

9  gang affiliates just left him alone.  RT 80.  The no-good list – which Mr. Toscano describes as a

10 gang's "hit list" for assault and murder – has thousands of names on it.  RT 79.  He knew he was on

11 the list since about 2002.  RT 105, 108, 117.

12       Mr. Toscano was released to the Pelican Bay general population on or about March 28, 2011.

13 Toscano did not object to his release to the general population.  RT 133-134.  At the time, he had a

14 plan to attack a Northerner once he was released from the SHU and then ask for protective custody.

15 He apparently had no one in particular in mind, and simply wanted to hurt one of the Northerners

16 before he started his new life in an SNY.  He testified at his deposition:  "My initial thought, my

17 initial plan was, you know, I was still young, I was still, you know, I was just going to retaliate first

18 then I was just going to lock it up.  I was going to get one of them first then I was gonna say, all

19 right, I'm done.  Lock it up, go SNY."  Docket # 199-1, Toscano Depo., Reporter's Transcript (RT)

20 107-108; *see also* RT 285-287.[6]  Once he reached general population, however, Mr. Toscano saw

21

22    [5] The DRB memo stated that Mr. Toscano's disciplinary history included rules violation
reports for:  slashing assault of an inmate in 1993; mutual combat in 1996, 1998, and 1999;
23 possession of a weapon in 1997 and 1998; possession of dangerous contraband in 2002; and
possession of a deadly weapon in 2003.  Docket # 199-3 at 27.

24    [6] The transcript of Mr. Toscano's March 20, 2014 deposition is found at Docket # 199-1.  As
25 his is the only deposition transcript in the record, all references to an "RT" followed by a page
number are to pages in the reporter's transcript of Mr. Toscano's deposition.

26       Mr. Toscano argues that the deposition transcript "is not accurate," that he intends to sue the
27 stenographer, and until then the transcript "should be deemed false, unauthorized, and stricken from
the records and misconduct charges should be filed" against defense counsel for presenting it.
28 Docket # 217 at 4.  Mr. Toscano has not identified a single inaccuracy in the very lengthy deposition
transcript, nor has he given any plausible explanation for why the deposition transcript would be

United States District Court

For the Northern District of California

1    about a dozen Northerners and realized there were "too many to handle," so he abandoned his plan

2    to attack one of them and instead asked to go to an SNY.  RT 107-108, 112, 113, 120.  Mr. Toscano

3    believed prison officials had no choice but to put him in an SNY if he had safety issues. RT 109 (if

4    you have "safety issues, they can't put you nowhere, they got no choice but to send you to SNY").

5          Mr. Toscano was in general population for 7-10 days, during which time Northerners asked

6    for his paperwork, i.e., the documents of his case that would allow the reader to figure out his

7    background.  Toscano told them he did not have his paperwork.  RT 122-123.

8          On April 6, 2011, Mr. Toscano asked correctional counselor ("C/C") Webster to put him

9    "into protected custody and sen[d him] to a sensitive needs yard (SNY), as plaintiff was targeted for

10   assault/murder."  Docket # 20 at 13.  C/C Webster told Mr. Toscano that he would have a lieutenant

11   talk to Mr. Toscano.  *Id.*  "A padlock was placed on his door for his safety."  *Id.* (This apparently

12   was not that uncommon, as Mr. Toscano testified all the Northerners had padlocks on their doors

13   because of disputes with the Southerners.  RT 60.)  C/C Webster wrote a chrono dated April 6, 2011

14   in which he noted that Mr. Toscano had said "that upon being released from SHU he intended to

15   come to the yard and deal with a situation and it would be over.  However, it did not work out that

16   way and now he feels that he has safety concerns."  Docket # 196-1.  Webster thought the

---

18   false.  A great number of the statements he made in the deposition are entirely consistent with
     statements he has made in other documents, thereby showing the absurdity of the idea that the whole
19   transcript should be deemed false.

20        Mr. Toscano's argument about the deposition transcript is the same kind of heated assertion
     as the "he's a liar," "she is lying," "documents are fabricated," and "people fabricated things"
21   arguments that permeate Mr. Toscano's presentations throughout this action and his opposition to
     the motion for summary judgment.  In almost every instance, Mr. Toscano has failed to provide any
22   fact to support his allegations of lies and fabrications.  Merely stating over and over that an opponent
     is lying or that documents have been fabricated – without presenting any explanation of what portion
23   of a statement or document is false and without offering an explanation of one's view of the true
     state of events – is insufficient to raise a triable issue.  "When the nonmoving party relies only on its
24   own affidavits to oppose summary judgment, it cannot rely on conclusory allegations unsupported
     by factual data to create an issue of material fact."  *Hansen v. United States*, 7 F.3d 137, 138 (9th
25   Cir. 1993); *see, e.g., United States v. 1 Parcel of Real Property*, 904 F.2d 487, 489, 492 & n.3 (9th
     Cir. 1990) (claimant "offered a detailed declaration painting a picture entirely different from that
26   described by the government" regarding how a drug transaction had not involved the house; had his
     declaration only to "set forth conclusory allegations, this case would be different" because
27   conclusory allegations do not raise a triable issue); *Marks v. United States*, 578 F.2d 261, 262 (9th
     Cir. 1978) (FOIA plaintiff's contention that relevant documents could have been destroyed or
28   removed, "assumes, without the slightest factual basis, that records were either destroyed or
     secreted.  Such a conclusory allegation does not raise a genuine issue for trial").

United States District Court
For the Northern District of California

"situation" to which Mr. Toscano referred may have been gang-related.  Docket # 196 (Webster Decl.) at 2.[7]

On April 7, 2011, Mr. Toscano was taken to the program office to speak to lieutenant Strain. Mr. Toscano provided information about Northern inmates in his section who had asked for his name and other information.  Docket # 20 at 13-14.  Lieutenant Strain wrote a CDC-114D notice putting Mr. Toscano into administrative segregation, and that form was approved by captain Bell. Docket # 199–3 at 33. The CDC-114D notice does not mention protective custody, although it does state that he was being put in ad-seg because Mr. Toscano had "expressed concerns regarding your safety and the safety of others," that would be investigated by sergeant Basso.  *Id.*

The next day, April 8, 2011, prison officials searched the cell(s) of the two Northern inmates as to whom Mr. Toscano had provided information.  RT 129.  There is no evidence those inmates knew why their cell was searched.  Mr. Toscano speculates that the search the day after he talked to lieutenant Strain made it "obvious" to the inmates that the search was due to information Mr. Toscano provided to prison officials, Docket # 20 at 14, yet admits that the officers did not tell the inmates why they were conducting a cell search, RT 151, and thought that there normally were three cell searches per day in general population.  RT 151.

An Institutional Classification Committee (ICC) hearing was held on April 13, 2011 to review Mr. Toscano's ad-seg placement.  *See* Docket # 199-3 at 4.  The report for the ICC hearing stated that sergeant Basso was conducting an investigation into Mr. Toscano's self-expressed safety concerns and that Mr. Toscano would remain in ad-seg pending completion of that investigation. *Id.*

In preparation for his interview of Mr. Toscano, sergeant Basso looked at Mr. Toscano's central file and saw several items of confidential information.  There was an August 15, 2000 memorandum "describing a Northern Structure/Nuestra Familia gang roster of inmates in good standings and a 'hit-list' of inmates in bad standing with the gang (also called a 'bad news list').

---

[7]  Mr. Toscano states that he made this statement to lieutenant Strain rather than C/C Webster.  RT 126-27.  The dispute as to which of the two correctional officials heard the statement Mr. Toscano admittedly made is not a material dispute.

1   This list showed that Toscano was in good standings with the gang and was not on the 'bad news

2   list'."  Docket # 194 at 6.  There were over 260 names on the "bad news list."  *Id.*  Basso noted that

3   "[i]t is not CDCR's policy to place all inmates listed on such lists in a sensitive needs yard."  *Id.*

4   There also was an August 6, 2002 chrono "indicating that gang investigators intercepted

5   communication between gang associates stating that Toscano was still in good standings with the

6   gang and was trying to be moved to be housed with another gang member."  *Id.*  There also was a

7   "confidential memorandum from 2002, which stated that Toscano possessed the Nuestra Familia

8   Constitution for recruiting purposes."  *Id.*  There also was a memorandum "documenting a note

9   found by correctional officers in 2004 that stated that Toscano was deemed 'no good' by the

10  Northern Structure prison gang, because he was sharing gang materials without authority."  *Id.*

11  Basso also reviewed a December 2010 confidential memorandum by C/C Nealy regarding the 2002

12  and 2004 information, as well as her interview with Toscano about his safety concerns during which

13  Toscano said he knew about the 2002 and 2004 information "but it is old news," and that he "would

14  have no problems programming on any general population yard at any prison."  *Id.*

15         Sergeant Basso interviewed Mr. Toscano in an office on April 16, 2011 and thereafter wrote

16  a memorandum to Facility B captain R. Bell.  Docket # 194 at 3.  During the interview, Mr. Toscano

17  said that upon his release to general population, he realized his life was in danger.  *Id.*  Mr. Toscano

18  also stated that he had dissociated from the Northern Structure gang in 2000 or 2001, and wanted to

19  start the gang debriefing process.  *Id.*  Sergeant Basso further states that he asked Mr. Toscano

20  numerous questions, and that Mr. Toscano "gave [him] very little information, and nearly no

21  confidential information."  *Id.*  Basso asked Mr. Toscano to compose a handwritten biography

22  regarding his association with the Northern Structure gang, but Mr. Toscano never completed a

23  biography.  *Id.*  "Based on Toscano's responses" during the April 16, 2011 interview, sergeant Basso

24  wrote in his memorandum that he "believed Toscano was 'telling just the minimum amount of truth

25  and facts in order to get to a Sensitive Needs Program (SNY)' and 'that Toscano is providing staff

26  with limited information and is not fully disclosing all pertinent information to gain access to [a

27  sensitive needs yard] where he can proceed with his unknown agenda.'" Docket # 194 at 4

28  (alteration in source).  Basso states that, at the end of the interview, he told Mr. Toscano that he

**United States District Court**
For the Northern District of California

1   would "write up a confidential memorandum regarding the interview and that he would be seen by

2   the institutional classification committee regarding his housing placement."  *Id.* (Mr. Toscano

3   disputes this and states that Basso said that Mr. Toscano "would go to (SNY) 2-3 weeks following

4   his reports."  Docket # 221 at 2.)

5          A few weeks later, Mr. Toscano told sergeant Basso that a committee was waiting for the

6   results of his investigation.  Sergeant Basso then checked Mr. Toscano's central file and saw that the

7   memorandum he had written regarding the interview was not in his file.  Sergeant Basso hand-

8   delivered a second copy of the report to the records department for placement in Mr. Toscano's file,

9   told the counselor he had done so, and told Mr. Toscano that he had fixed the problem.

10         Mr. Toscano filed an inmate grievance against sergeant Basso claiming that sergeant Basso

11  said he could stop the report and address his grievance or, if Mr. Toscano would let him finish

12  typing his report, he would get Mr. Toscano sent to a transitional program unit for an SNY.  Docket

13  # 20 at 14.  Sergeant Basso denies that he said any of these things, and states that he told Mr.

14  Toscano he would complete a memo for the ICC to review.  Docket # 194 at 8.  It is undisputed that

15  sergeant Basso had no authority to send Mr. Toscano to an SNY.  *Id.*  On or about April 17, 2011,

16  sergeant Countess told Mr. Toscano he would be in ad-seg from six to twelve months before being

17  sent to an SNY. Mr. Toscano remained in ad-seg through June 2011.

18         In anticipation of an ICC hearing regarding Mr. Toscano's housing, C/C Clower talked to

19  Mr. Toscano on June 21, 2011 at his cell-front in ad-seg.  Docket # 198 (Clower Decl.) at 2.  Mr.

20  Toscano states that C/C Clower remembered him from the SHU and was hostile to him because Mr.

21  Toscano had filed an appeal about a false validation years ago and did not withdraw it.  Docket # 20

22  at 14.  The parties agree that C/C Clower told Mr. Toscano he was scheduled for an ICC hearing and

23  that Mr. Toscano refused to attend it.  *Id.* at 15; RT 180-181.  The parties disagree as to what else

24  was said.  Mr. Toscano states that he told Clower he wanted to go to an SNY, as he had been

25  promised by sergeant Basso.  Amend. Compl. at 14-15; RT 185; *but see* RT 180-181 (Mr. Toscano

26

27

28

United States District Court
For the Northern District of California

testifying that he does not recall what they said).[8]  Clower wrote in a chrono for the meeting that Mr. Toscano said he had no safety concerns and "'all these investigations and documentations about my safety concerns are all made up and not true, and no I don't want to go to a SNY. Sgt. Basso lied about me.  It is a bogus investigation.'"  Docket # 199-3 at 3.

Mr. Toscano argues that C/C Clower's statements are "not true," and that he told her he wanted to go to an SNY.  Docket # 217 at 4.  Interestingly, however, Mr. Toscano's statements in an inmate appeal dated April 17, 2011 closely track what C/C Clower wrote.  In his inmate appeal, Mr. Toscano wrote:  "Look I want out of this unlawful confinement ad/seg immediately transferred to a mainline that going to fit my needs.  As I mentioned I'm not here for 'disciplinary reasons' & this continued unnecessary bogus investigation on (2) documents that were investigated 7-9 yrs. ago is a constitutional violation, as I should be transferred immediately with my mainline status."  Docket # 227-1 at 4.

An ICC hearing was held on June 23, 2011, at which prison officials decided to release Mr. Toscano from ad-seg to "FAC-B only" and to remove his single-cell designation.  Docket # 199-3 at 3.  Mr. Toscano chose not to appear at the ICC hearing where he could have told the committee of his disagreement with C/C Clower's report.  RT 186-187.  Mr. Toscano "rarely go[es]" to committees because he does not trust them.  RT 187.

On June 24, 2011, Mr. Toscano was told by two correctional officers to pack up and that he would be moved.  Mr. Toscano smuggled with him a razor that he had found to use as a weapon.  RT 165, 208.  He was taken to the general population unit of B-6, rather than the TPU/SNY unit of B-3, where he had expected to be taken.  Mr. Toscano informed C/O Bustamante and C/O Garza that he could not be housed in B-6 because he had "'locked it up' for protected custody" and was

---

[8]  Clower's version of the statement is different.  Clower declares that Mr. Toscano stated, "'I just want to be released to GP.  I can go to any GP except Pelican Bay.'"  Clower Decl., p. 2.  When asked why he could not be released to Pelican Bay's GP, Mr. Toscano stated that Pelican Bay GP didn't have "'any programs and [he didn't] want to be where there is no program.'"  *Id.*  Clower understood Mr. Toscano's use of "program" to mean programs for inmates such as job assignments, education or vocational training.  *Id.*  Clower also declares that Mr. Toscano said that he had no safety concerns, did not want to go to an SNY, and that "'all these investigations and documentations about my safety concerns are all made up and not true."  *Id.*  When asked, Mr. Toscano denied that he had any enemy concerns in the prison system.

14

United States District Court

For the Northern District of California

1   "targeted for assault/murder."  Docket # 20 at 15.  Mr. Toscano further states that he explained that

2   he had done an interview with lieutenant Strain on April 7 and sergeant Basso on April 16 in which

3   he provided information, "thus making plaintiff an informant, and targeted for assault/murder."

4   Docket # 224 at 2.  C/Os Bustamante and Garza told him "they were given orders to house plaintiff

5   there."  *Id.*  C/O Bustamante declares that he doesn't recall the events involving Mr. Toscano in June

6   2011 but doubts that they are true because, if Mr. Toscano had said these things, his normal practice

7   would have been to immediately contact his supervisor, the sergeant, and (if he believed Mr.

8   Toscano was facing a real, known threat), he would have moved Mr. Toscano to a holding cell while

9   discussing the matter with the sergeant.  Docket # 193 (Bustamante Decl.) at 2.  C/O Garza declares

10  that he did not meet Mr. Toscano until June 27, 2011.  Docket # 197 (Garza Decl.) at 2.  It is

11  undisputed, however, that the safety concerns Mr. Toscano reportedly voiced were the same

12  concerns that had just been investigated and considered by the ICC, which one day earlier had

13  directed his transfer to the facility to which he was being sent.

14          Mr. Toscano was single-celled in the B-6 housing unit for a few days until June 27, 2011,

15  when Mr. Ramirez was moved into the cell with him.  Docket # 20 at 15. Mr. Toscano was not asked

16  and did not consent to Mr. Ramirez's placement in his cell.  According to Mr. Toscano, Mr. Ramirez

17  did not want to assault Mr. Toscano when he first arrived because he did not know about Mr.

18  Toscano.  RT 197.  In fact, Mr. Ramirez thought Mr. Toscano was White, and did not realize

19  otherwise until Mr. Toscano told Mr. Ramirez, "I was half Mexican, so I was from up North, so they

20  labeled me as a Northerner."  RT 89.  Mr. Ramirez told Mr. Toscano he was active, and Mr.

21  Toscano told Mr. Ramirez he was not active.  RT 37.  Mr. Toscano believes that Mr. Ramirez did

22  not have a weapon when he arrived in the cell and instead obtained it from a Northerner in an upper

23  tier cell at shower time.  RT 45.  Mr. Toscano contemplated attacking Mr. Ramirez upon his arrival

24  in the cell, and could have stabbed him with the razor Mr. Toscano had smuggled with him from ad-

25  seg.  RT 87-90.

26          The parties agree that Mr. Toscano requested to be moved on June 27, 2011, but disagree

27  somewhat as to what he said.  Mr. Toscano stated that he told C/Os Bustamante and Garza "that

28  plaintiff could *not* live with I/M Ramirez because he was an active gang member and plaintiff was

protected custody (SNY)." Docket # 20 at 15; Docket # 222 at 2. *But cf.* RT 67 (Toscano testifying that, with regard to alerting C/O Eberly, "I couldn't tell him I was protective custody cause my cellee probably would have got me from behind in the cell.")  Mr. Toscano states that "[o]fficials" "told plaintiff to send a request to the lieutenant, if we want to separate, or do what we go to do to separate" and walked away.  Docket # 20 at 16 (error in source).[9]  C/O Garza describes the events of June 27 somewhat differently, and recalls that "Toscano told me that Ramirez was a 'Northerner' and that Toscano was a 'nonaffiliate.'  Mr. Toscano did not tell me he needed to get out of his cell or express any urgency or safety concerns to me."  Docket # 197 at 2.  C/O Garza told Mr. Toscano that he would pass along the information and check into accommodating a cell move.  *Id.*  C/O Garza states that "nothing about the situation made me believe that Toscano had an urgent need to change cells," and he did not perceive that either of the inmates posed a threat to each other.  *Id.* at 2-3.

C/O Garza checked the bed cards in the program office in the unit, which included information as to "whether an inmate identifies himself as a Northern or Southern Hispanic inmate. Both Toscano and his cellmate Ramirez were identified as Northerners."  *Id.* at 3.  As a floor officer, C/O Garza would not have had authority to override a classification committee's determination that Mr. Toscano was categorized as a Northerner for housing purposes.  *Id.*  During a shift change on June 27, C/O Garza told an officer on third watch that Mr. Toscano informed him that he was nonaffiliated and his cellmate was a Northerner.  That third watch officer also verified that the bed cards indicated both inmates were identified as Northerners.  *Id.*  As of that date, neither Mr. Toscano nor Mr. Ramirez was validated as an active member or associate of any prison gang.  *Id.*

Mr. Toscano states that he also informed C/O Thompson that he "could not live with I/M Ramirez because he was an active gang member."  Docket # 226 at 1.  C/O Thompson recalls that Mr. Toscano and Mr. Ramirez told him "together that they weren't getting along and that they

---

[9] Mr. Toscano states that "do what we [got] to do to separate" meant the inmates were to fight.  Mr. Toscano does not, however, state that anyone actually told the inmates to fight, and his strained interpretation of the meaning of the statement is not competent evidence that any correctional officer directed him to engage in a fight with his cellmate.  Without more, the inference he seeks to draw is not reasonable.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1    would like a bed move."  Docket # 191 (Thompson Decl.) at 2.  C/O Thompson told the inmates that

2    he would tell the Floor 1 Officers "to see what they could do about getting them a bed move"

3    because Floor 2 Officers like him did not make cell moves because they did not work in the unit all

4    the time.  *Id.*

5         Mr. Toscano states that he also informed C/O Eberly on June 27 that he "could not live with

6    I/M Ramirez because he was an *active* Northern inmate and plaintiff was not active and was not

7    suppose to be house here."  Docket # 227 at 1 (errors in source).  Mr. Toscano again requested a cell

8    change when C/O Eberly was passing out mail, and C/O Eberly said "no" in what appeared to Mr.

9    Toscano to be an angry manner.  *Id.* at 2.  After the mail was handed out and the inmate count was

10   completed, C/O Eberly called the program office and told an officer that Mr. Toscano "said he was

11   not getting along with his cellmate.  That officer told [C/O Eberly] that Facility B staff from second

12   watch (the 6 a.m. to 2 p.m. shift) was already looking into the possibility of a cell move for

13   Toscano."  Docket # 190 (Eberly Decl.) at 4.  Thus, even if it appeared to Mr. Toscano that his

14   requests were falling on deaf ears, prison officials did take steps in response to those requests – two

15   different officers checked his bed card and they were looking into the possibility of a cell change.

16   But their actions had not proceeded very far before the fight occurred just a few hours after Mr.

17   Martinez was moved into the cell.

18        5.    The Cellmates Fight And Force Is Used By Correctional Staff

19        Mr. Toscano and Mr. Ramirez were let out of their cell to take showers on June 27, 2011.  In

20   their housing unit, there was one shower upstairs and one shower downstairs, and each inmate

21   normally would go into a different shower.  On June 27, Mr. Toscano knew Mr. Ramirez would be

22   going upstairs to borrow shower shoes.  RT 46-48.  Nonetheless, when let out of their cell to shower,

23   Messrs. Ramirez and Toscano both went upstairs.  RT 48.  Before either reached the shower, Mr.

24   Ramirez attacked Mr. Toscano by hitting him several times in the face.  The inmates then fought and

25   the control booth operator sounded the alarm.

26        The parties disagree as to whether Mr. Ramirez used a weapon and stabbed Mr. Toscano

27   during the fight.  Although Mr. Toscano states that he was stabbed in the shoulder by Mr. Ramirez,

28   the responding officers state that they saw no weapon being used during the fight or stab wounds,

17

**United States District Court**
For the Northern District of California

1   the medical report lists no wounds or punctures, and Mr. Toscano never saw the weapon or sought

2   care for any stab wound.  *Compare* Docket # 20 at 16 *with* Docket # 190 at 5, Docket # 191 at 5; *and*

3   RT 206.  The photographic evidence supports defendants' view and undermines plaintiff's statement

4   that he was stabbed.  An inmate-made weapon later was found in the holding cell in which Mr.

5   Ramirez was placed after the fight.  *See* Docket # 189-3 at 12 (photo of weapon shows a wrapped

6   pen-sized object with a needle or pin point).  Mr. Ramirez received a rule violation report charging

7   him with assault with a weapon, but was found guilty of only possession of a weapon due to the

8   absence of evidence that Mr. Ramirez had been stabbed, the absence of any evidence that a weapon

9   had been seen during the fight, and the fact that the weapon had been found in the holding cell rather

10  than at the site of the fight.

11          C/Os Eberly and Thompson responded to try to stop the fight.  The parties disagree as to the

12  amount of force used by C/Os Eberly and Thompson.

13              Mr. Toscano's version: While fighting with Mr. Ramirez, Mr. Toscano was assaulted

14  by C/O Eberly and C/O Thompson, "who began beating plaintiff with their batons and pepper

15  sprayed in the eyes/face."  Docket # 20 at 16.  Defendants "began hitting plaintiff in the head and

16  ears with the batons causing plaintiff's head and ears to swell up . . . [and] also began kicking

17  plaintiff in the back – ribs, arm, causing serious injuries to plaintiff."  Docket # 217 (verified

18  opposition) at 18.  After the fight ended, Mr. Toscano "was then placed in restraints behind his back,

19  picked up half ways, then deliberately dropped face first on the ground, causing more pain and

20  injuries."  Docket # 20 at 16; *see also* Docket # 217 at 17 ("plaintiff was put in restraints pick up

21  about (4) feet and dropped causing injuries, swelling to plaintiff's left knee, chest, lip." (errors in

22  source)).  Mr. Toscano also states that, had the fight occurred in the cell, Mr. Ramirez would have

23  fared worse: "I would have got him first.  I would have beat him up first, beat him, cut him with the

24  razor I had."  RT 208.

25              Defendants' Version:  Defendants describe a much more limited use of force and

26  deny that Mr. Toscano was dropped on the floor.  *See* Docket # 190 at 4-5; Docket # 191 at 4.  C/O

27  Eberly and C/O Thompson were at different locations in the housing unit when each heard the

28  control booth officer yell, "Get Down!" and saw the two inmates on the second-tier floor fighting.

C/O Eberly approached them, ordered the inmates to stop fighting, and sprayed Mr. Ramirez with a short burst of pepper spray from about seven feet away.  C/O Thompson ran past C/O Eberly and used his expandable baton to strike Mr. Toscano – who was then on top of Mr. Ramirez and struggling with Mr. Ramirez – once in the area of his buttocks.  Mr. Ramirez and Mr. Toscano continued to fight and disregarded commands to stop, so C/O Eberly sprayed Mr. Toscano with a short burst of pepper spray from approximately seven feet away, and the spray hit Mr. Toscano in the face.  Docket # 190 at 4.  Mr. Toscano started to lie flat on his stomach, but Mr. Ramirez continued to swing at Mr. Toscano, so C/O Eberly sprayed Mr. Ramirez a second time with a short burst of pepper spray from approximately six feet away, and the spray hit the left side of Mr. Ramirez's face.  At this point, Mr. Ramirez laid down on his stomach and the fighting stopped.  The inmates were separated and handcuffed.  C/O Thompson handcuffed Mr. Ramirez and C/O Eberly focused on Mr. Toscano.  C/O Eberly "handcuffed Toscano on the ground and then helped him to a standing position.  Though the ground was slippery with pepper spray, Toscano did not fall."  Docket # 190 at 5.  Eberly led Mr. Toscano downstairs to be medically evaluated, and "did not drop" him.  *Id.*

Photos taken of Mr. Toscano after the fight show only redness and slight abrasions.  *See* Docket # 142 at 74-87; Docket # 189-3 at 1-12.  The nurse who examined Mr. Toscano after the fight documented the injuries as consisting of only pepper spray to the eyes, and abrasions/scratches to the ear, back of the head, left arm and knees.  Docket # 189-2 at 22.  The nurse noted on the form that Mr. Toscano was released back to custody at "1832," which was less than a half-hour after the fight started.

6.      Housing After The Fight

On June 27, 2011, lieutenant Barneburg and captain Bell issued a CDC-114D notice to Mr. Toscano putting him in ad-seg due to the fight.  Docket # 20 at 16.

After the fight with Mr. Ramirez, Mr. Toscano requested SNY placement.  In early July 2011, Mr. Toscano signed a CDC128-B requesting SNY placement.

Prison officials thereafter considered his case repeatedly and often came to different decisions because there was mixed information about Mr. Toscano and a disagreement among prison

1  officials as to the requirements for entry to an SNY.  It is undisputed that the DRB is the highest

2  authority in the CDCR on housing matters.

3       Mr. Toscano was endorsed for placement at Kern Valley's SNY on August 3, 2011 by a

4  classification staff representative (CSR).  Docket # 199-3 at 22.  The CSR wrote that Mr. Toscano's

5  retention in ad-seg was approved pending the transfer, and that the "transfer approval expired

6  12/1/2011."  *Id.*  On August 31, 2011, at an ICC hearing Mr. Toscano refused to attend, the ICC

7  released Mr. Toscano to the Pelican Bay TPU to await his transfer to the Kern Valley SNY.  Docket

8  # 199-3 at 21.

9       On December 1, 2011, while Mr. Toscano was still housed in the TPU, his endorsement for

10  SNY housing expired.  C/C Soderlund was responsible for reviewing the case to recommend

11  whether to extend Mr. Toscano's endorsement to an SNY, and realized that Mr. Toscano should not

12  have been housed in the TPU because he had not debriefed, and CDCR policy prohibited housing

13  inactive gang associates in the SNY without debriefing.  Thus, Mr. Toscano was not eligible to be

14  housed in the TPU.  C/C Soderlund sent to Mr. Toscano a CDC-114D notice that he was being

15  moved to ad-seg.  The notice stated: "Based upon CDCR policy, your current SNY endorsement is

16  not appropriate, as you have not completed the debriefing process and/or have not been reviewed by

17  DRB for SNY placement."  Docket # 199-3 at 31. The CDC-114D notice further informed Mr.

18  Toscano that he would be kept in ad-seg pending an ICC review and a review of his future housing

19  and program needs.  *Id.*

20       At a hearing on December 14, 2011, the ICC referred Mr. Toscano to a CSR and again

21  recommended that the CSR approve him for placement in an SNY.  Docket # 199-3 at 18.  In

22  January 2012, a CSR referred Mr. Toscano's case to the chief deputy warden for further

23  consideration because, although the ICC had recommended SNY placement based on safety

24  concerns, "SNY placement is inappropriate without the inmate first completing the debriefing

25  process and is inconsistent with departmental policy.  The inmate's safety concerns support [ad-seg]

26  placement until he has completed the debriefing process or until the safety issues are resolved."

27  Docket # 199-3 at 19.  The ICC held a hearing on January 20, 2012, noted that the CSR had not

28  identified the source of the supposed policy requiring debriefing before SNY placement, and

United States District Court
For the Northern District of California

referred the matter to a CSR with a recommendation of SNY placement.  Docket # 199-3 at 16.  In response, a CSR memo dated February 15, 2012, described several documents written in 2000, 2002, and 2003 that "document[ed] where the policy was written" that an inactive gang affiliate had to debrief to be placed into an SNY.  Docket # 199-3 at 15.  The CSR referred the matter to the chief deputy warden.  *Id.*

The ICC held a hearing on May 23, 2012, and decided to retain Mr. Toscano in ad-seg pending DRB review, and referred the case to the DRB with a recommendation that Mr. Toscano be sent to Pelican Bay SHU or Corcoran SHU "based on prison gang validation as an 'inactive' associate of the Northern Structure prison gang, safety concerns, and refusal to debrief as required per departmental policy prior to SNY housing."  Docket # 199-3 at 13.  The ICC memorandum noted that CDCR policy required an inmate to complete the debriefing process and be validated as a "dropout" prior to SNY placement, and that Mr. Toscano said he was not interested in debriefing and preferred to go before the DRB.  *Id.*

The DRB held a hearing on October 24, 2012 that Mr. Toscano refused to attend.  Docket # 199-3 at 11.  The DRB memo stated that the DRB reviewed the case and chose to "approve inmate Toscano for transfer to California State Prison, Corcoran SHU on indeterminate status due to self-expressed safety concerns."  *Id.*  The DRB memo further stated that the DRB retained "transfer control" and that a permanent transfer from the Corcoran SHU required prior DRB approval.  *Id.* The importance of this "transfer control" is that it prevents him "from being given future housing placements that could endanger his safety."  Docket # 195 (Hubbard Decl.) at 3-4.  "At the Corcoran SHU, Toscano would be surrounded by other inmates in a 180-degree design facility, like a general population housing unit, but there would be fewer opportunities for other inmates to have physical contact with Toscano compared to the general population.  Housing Toscano in the Corcoran SHU addressed Toscano's safety concerns, because it allowed for less physical contact with other inmate than in the general population."  *Id.* at 3.  The Corcoran SHU is less restrictive than the Pelican Bay SHU; for example, the cells have windows to the outside, inmates can see and speak to dozens of other inmates in the unit, and the inmates "exercise alongside dozens of other inmates in small management yards (fenced areas where other inmates are visible and audible)."  *Id.*  There is no

1   evidence that Mr. Toscano was harmed after the June 27, 2011 fight or since his placement in the

2   Corcoran SHU.

### III.   VENUE AND JURISDICTION

4       Venue is proper in the Northern District of California because a substantial part of the events

5   or omissions giving rise to the claims occurred at Pelican Bay State Prison in Del Norte County,

6   which is located within the Northern District.  *See* 28 U.S.C. §§ 84, 1391(b).  The Court has federal

7   question jurisdiction over this action brought under 42 U.S.C. § 1983.  *See* 28 U.S.C. § 1331.

### IV.   LEGAL STANDARD FOR SUMMARY JUDGMENT

9       Summary judgment is proper where the pleadings, discovery and affidavits show that there is

10  "no genuine dispute as to any material fact and [that] the moving party is entitled to judgment as a

11  matter of law."  Fed. R. Civ. P. 56(a).  A court will grant summary judgment "against a party who

12  fails to make a showing sufficient to establish the existence of an element essential to that party's

13  case, and on which that party will bear the burden of proof at trial . . . since a complete failure of

14  proof concerning an essential element of the nonmoving party's case necessarily renders all other

15  facts immaterial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  A fact is material if it

16  might affect the outcome of the lawsuit under governing law, and a dispute about such a material

17  fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the

18  nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

19      Generally, as is the situation with Defendants' challenge to the Eighth Amendment and

20  retaliation claims, the moving party bears the initial burden of identifying those portions of the

21  record which demonstrate the absence of a genuine dispute of material fact.  The burden then shifts

22  to the nonmoving party to "go beyond the pleadings, and by his own affidavits, or by the

23  'depositions, answers to interrogatories, or admissions on file,' designate 'specific facts showing

24  that there is a genuine issue for trial.'"  *Celotex*, 477 U.S. at 324.

25      Where, as is the situation with Defendants' qualified immunity defense, the moving party

26  bears the burden of proof at trial, he must come forward with evidence which would entitle him to a

27  directed verdict if the evidence went uncontroverted at trial.  *See Houghton v. South*, 965 F.2d 1532,

28  1536 (9th Cir. 1992).  He must establish the absence of a genuine dispute of fact on each issue

**United States District Court**
For the Northern District of California

United States District Court

For the Northern District of California

1    material to his affirmative defense.  *Id.* at 1537; *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. at

2    248.  When the defendant-movant has come forward with this evidence, the burden shifts to the non-

3    movant to set forth specific facts showing the existence of a genuine dispute of fact on the defense.

4         A verified complaint may be used as an opposing affidavit under Rule 56, as long as it is

5    based on personal knowledge and sets forth specific facts admissible in evidence.  *See Schroeder v.*

6    *McDonald*, 55 F.3d 454, 460 & nn.10-11 (9th Cir. 1995) (treating plaintiff's verified complaint as

7    opposing affidavit where, even though verification not in conformity with 28 U.S.C. § 1746,

8    plaintiff stated under penalty of perjury that contents were true and correct, and allegations were not

9    based purely on his belief but on his personal knowledge).  Mr. Toscano's amended complaint

10   (Docket # 20) and his opposition (Docket # 217) are made under penalty of perjury and the factual

11   statements therein are considered in opposition to the motion for summary judgment.

12        The court's function on a summary judgment motion is not to make credibility

13   determinations or weigh conflicting evidence with respect to a disputed material fact.  *See T.W. Elec.*

14   *Serv. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).  The evidence must be

15   viewed in the light most favorable to the nonmoving party, and inferences to be drawn from the facts

16   also must be viewed in the light most favorable to the nonmoving party.  *See id.* at 631.

17                                    **V.    DISCUSSION**

18   A.    Deliberate Indifference To Safety

19         1.    Eighth Amendment

20        The Constitution does not mandate comfortable prisons, but neither does it permit inhumane

21   ones.  *See Farmer v. Brennan*, 511 U.S. 825, 832 (1994).  Deliberate indifference to an inmate's

22   health or safety may violate the Eighth Amendment's proscription against cruel and unusual

23   punishment.  *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).  A prison official violates the Eighth

24   Amendment only when two requirements are met: (1) the deprivation alleged is, objectively,

25   sufficiently serious, i.e., "the inmate must show that he is incarcerated under conditions posing a

26   substantial risk of serious harm," and (2) the official is, subjectively, deliberately indifferent to the

27   substantial risk of serious harm.  *See Farmer*, 511 U.S. at 834.

28

United States District Court

For the Northern District of California

The focus in this case is the second, or deliberate indifference, prong.  Under the deliberate indifference standard, the prison "official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837.  The prisoner "need not show that a prison official acted or failed to act believing that harm would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." *Id.* at 842.  "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Id.* (citation omitted).

When prison officials actually know of a substantial risk to inmate safety, they "may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted. A prison official's duty under the Eighth Amendment is to ensure "'reasonable safety,'" a standard that incorporates due regard for prison officials' "unenviable task of keeping dangerous men in safe custody under humane conditions.  Whether one puts it in terms of duty or deliberate indifference, prison officials who act reasonably cannot be found liable under the Cruel and Unusual Punishments Clause." *Farmer*, 511 U.S. at 844-45 (citations omitted).

When, as here, the choices confronting prison officials involve competing safety concerns, prison officials may consider the safety of other inmates.  *See Berg v. Kincheloe*, 794 F.2d 457 (9th Cir. 1986).  There, the plaintiff alleged that a prison official ordered him "to report to a 'tier porter job' in the protective custody unit" and, when plaintiff complained that doing so would endanger his life, responded by "threaten[ing] him with disciplinary action if he refused to report to the site." *Id.* at 458.  The plaintiff was beaten and raped at the job site by his cellmate about an hour later. *Id.* The court held that the allegations had stated a cause of action and summary judgment should not have been granted to defendant who presented no evidence to refute them. *Id.* at 461.  Although it allowed the case to proceed, the *Berg* court recognized that evidence might be developed providing a fuller picture of prison officials' decision-making, e.g., considerations of safety to other inmates or choosing the best means of protecting the plaintiff. *See id.* at 461.  The court discussed the

United States District Court
For the Northern District of California

1    consideration that must be given in light of the difficult choices for prison officials in matters of

2    inmate safety, and that the choices made "may implicate 'competing institutional concerns for the

3    safety of prison staff or other inmates.' Removing a prisoner from a hostile or vengeful inmate may

4    protect the prisoner, but the move may endanger others–particularly if the prisoner is himself

5    dangerous." *Id.* (citation omitted).  The court further discussed how these considerations impacted

6    the Eighth Amendment analysis.

> We believe that in applying the "deliberate indifference" standard in
> this particular context, the trier of fact (judge or jury) must take into
> account the foregoing considerations. Specifically, the trier must
> consider whether, in allegedly exposing the prisoner to danger, the
> defendant prison official(s) were guided by considerations of safety to
> other inmates, whether the official(s) took "prophylactic or preventive
> measures" to protect the prisoner, *Whitley [v. Albers*, 475 U.S. 312,
> 322 (1986)], and whether less dangerous alternatives were in fact
> available. More generally, the legal standard must not be applied to an
> idealized vision of prison life, but to the prison as it exists, and as
> prison official(s) are realistically capable of influencing. In short, the
> trier must consider context, as well as consequences. If the evidence
> only involves a "dispute over the . . . existence of arguably superior
> alternatives," *id.*, then the Supreme Court has indicated that the
> plaintiff has not met his burden and the case should not be presented to
> a jury.

16   *Berg*, 794 F.2d at 462 (ellipses in original); *see also Lemire v. California Dep't of Corr & Rehab.*,

17   726 F.3d 1062, 1078 (9th Cir. 2013) (on deliberate indifference prong, plaintiff must demonstrate

18   that prison officials were aware of the substantial risk and "must show that there was no reasonable

19   justification for exposing the inmates to the risk").

20          a.    Mr. Toscano Is Released To General Population in March 2011

21          In February 10, 2011, the DRB decided to release Mr. Toscano to general population.  This

22   decision comported with the normal statewide policy to release to general population an inmate who

23   had been validated as an inactive gang affiliate.  CDCR also had a policy that an inactive gang

24   affiliate could not be sent to an SNY until he had debriefed and was considered a dropout from the

25   gang.  Mr. Toscano indisputably had not debriefed and was not considered a dropout from the

26   Northern Structure gang.  It is undisputed that, when the DRB made its decision, it took into account

27   a report that Mr. Toscano had said he would not attend the hearing, did not care as to which

28   institution he was released, and had to be released because he was inactive.  On the evidence in the

United States District Court

For the Northern District of California

1    record, no reasonable juror could find that defendants were deliberately indifferent to a substantial

2    risk of harm to Mr. Toscano in their housing decisions because they conducted a reasonable

3    investigation into his circumstances before deciding to release Mr. Toscano to the general

4    population in March 2011.

5              It also is undisputed that the DRB considered documents that had mixed information about

6    Mr. Toscano.  There was conflicting information from 2002: one message indicated Mr. Toscano

7    was targeted for assault, while another message verified that he was still on good terms with the

8    Northern Structure and Nuestra Familia prison gangs.  There was information from 2004 that Mr.

9    Toscano was sharing NF material without authority and that this could result in him being targeted

10   for assault, although the document did not say he was targeted for assault.  There was no current

11   information in his central file that put him on any "hit list," showed that he was currently targeted

12   for assault, or that he had any run-ins with the Northern Structure or Nuestra Familia prison gangs.

13   The DRB also had a report that, when asked in December 2010 about possible safety concerns based

14   on the 2002 and 2004 information, Mr. Toscano said this was "old news" and that he would have no

15   problems programming on a general population facility.  Mr. Toscano admitted that he did not ask

16   for protective custody before he was first released to the general population in 2011 because he

17   wanted to first attack a Northerner and then ask for protective custody.  RT 108, 133-134.  Mr.

18   Toscano has failed to prove or raise a triable issue that any defendant was deliberately indifferent to

19   his safety in connection with the decision to release him from the SHU to the general population in

20   March 2011.

21                      b.      Safety Concerns Voiced And Investigated In April 2011

22             Mr. Toscano fails to prove or show a triable issue that defendants acted with deliberate

23   indifference in failing to put him in the SNY in response to the safety concerns he voiced in April

24   2011.  When Mr. Toscano expressed safety concerns shortly after his arrival in the general

25   population, prison officials moved him to ad-seg for protection while they investigated his reported

26   safety concerns in April 2011.  Defendants did a thorough investigation and released him back to

27   general population in June 2011.  Mr. Toscano fails to prove or show a triable issue that defendants

28

United States District Court
For the Northern District of California

1   acted with deliberate indifference in failing to put him in the SNY in response to the safety concerns

2   he voiced in April 2011.

3        It is undisputed that Sergeant Basso thought Mr. Toscano was less-than-candid about gang

4   information and was concerned about the danger Mr. Toscano potentially posed if allowed into an

5   SNY.  Sergeant Basso worried that Mr. Toscano wanted to gain access to the SNY to "proceed with

6   his unknown agenda."  Docket # 194 at 4.  In reviewing Mr. Toscano's case, Basso considered

7   confidential information in Mr. Toscano's file that presented the same mixed information about Mr.

8   Toscano from 2002 and 2004 that was considered by the DRB in February 2011, was aware that Mr.

9   Toscano had admitted intending to attack someone less than a month earlier, and was aware that Mr.

10   Toscano was not a gang dropout.

11        Prison officials reasonably could and did take into consideration the potential risk to other

12   inmates in the SNY in evaluating Mr. Toscano's request to go there for purported safety concerns.

13   *See Berg*, 794 F.2d at 462.  CDCR officials had long been concerned with "sleeper" inmates getting

14   access to the SNY and attacking informants in the SNY, and CDCR policy was that the inmate had

15   to debrief and be a dropout – rather than just be an inactive gang affiliate – to be considered for SNY

16   placement.  Mr. Toscano was only a validated inactive gang associate, not a gang "dropout," and his

17   status did not generally warrant placement in the SNY.

18        Mr. Toscano urges that the February 14, 2012 memorandum that mentioned the debriefing

19   requirement for SHU placements was fabricated to retaliate against him for not withdrawing his

20   inmate appeals, but he offers no competent evidence to support his speculation.  *See* Docket # 217

21   at 12, 16, 21.  A jury could not draw a reasonable inference by latching onto Mr. Toscano's

22   speculative theory, especially when the memorandum applied statewide throughout the CDCR,

23   "reaffirm[ed]" a policy memorandum written a decade earlier, and made no mention of Mr. Toscano.

24   Mr. Toscano has failed to show a triable issue that the February 14, 2012 memorandum was

25   fabricated, retaliatory or otherwise did not reflect longstanding CDCR policy.

26        According to Mr. Toscano, he spoke privately to lieutenant Strain and provided information

27   about Northerners in his section who had asked for his name and other information, and the next day

28   those two inmates' cell was searched.  Cell searches were common – perhaps three a day – and there

United States District Court
For the Northern District of California

1    is nothing in the record to suggest that those two inmates were aware that Mr. Toscano's information

2    had led to their cell being searched.  More importantly, there is nothing to suggest the searches were

3    intended to instigate hostility by the two inmates against Mr. Toscano or that prison officials were

4    aware of risk to Mr. Toscano's safety resulting from the searches.

5          Mr. Toscano argues that he was told first that he would soon go to the SNY, and later was

6    told that he would be in ad-seg for many months before going to an SNY.  Regardless of whether

7    someone told him that, such a statement does not demonstrate deliberate indifference in failing to

8    send him to an SNY because he did not meet the established criteria for such placement.

9          On the evidence in the record, no reasonable jury could find that defendants were

10   deliberately indifferent to Mr. Toscano's safety needs in connection with the safety concerns he

11   expressed in April 2011.

12                 c.      Mr. Toscano's Housing During June 23-27, 2011

13         Mr. Toscano has failed to raise a triable issue on his claim that defendants were deliberately

14   indifferent in moving him back to general population on June 23, 2011.  It is undisputed that, when

15   prison officials moved Mr. Toscano back to general population, it was only after they had

16   investigated the concerns Mr. Toscano raised in April 2011 and determined that he should be housed

17   in general population and did not belong in the SNY.

18         Mr. Toscano was scheduled for an ICC hearing on June 23.  In anticipation of that hearing,

19   C/C Clower came to speak to Mr. Toscano.  The parties agree that Mr. Toscano told C/C Clower

20   that he refused to attend the ICC hearing.  The parties disagree as to what else was said.  Mr.

21   Toscano states that he expressed his desire to go to the SNY; C/C Clower states that Mr. Toscano

22   said he wanted to go to general population at any prison other than Pelican Bay because Pelican

23   Bay's general population did not have programs.  Their disagreement as to what was said does not

24   raise a triable issue because, even if Mr. Toscano had said he wanted to go to the SNY, he was only

25   reiterating a request that prison officials had just investigated and rejected, such rejection being

26   consistent with existing policy.

27         On June 23, the ICC decided to release Mr. Toscano from ad-seg to the general population.

28   Even if the ICC wanted to exclude Mr. Toscano from the policy that inactive inmates were not to be

United States District Court

For the Northern District of California

1  assigned to an SNY without first debriefing, there were no specific, corroborated threats to Mr.

2  Toscano's safety supporting his transfer to an SNY.  *See* Cal. Code Regs. tit. 15, § 3341.5(a)(8)

3  (2011) (one of the criteria making an inmate eligible for SNY placement is a verification "that the

4  inmate is in present danger of great bodily harm. The inmate's uncorroborated personal report, the

5  nature of the commitment offense or a record of prior protective custody housing shall not be the

6  sole basis for protective housing unit placement.")  The ICC considered the mixed information about

7  Mr. Toscano's relationship with the Northern Structure gang in 2002 and 2004, as well as Mr.

8  Toscano's view that any threats were "old news," in concluding that he did not have any specific

9  safety concerns on the general population.  When Mr. Toscano was escorted to general population

10  on June 24 after the ICC hearing, he continued to state that he was supposed to be in protective

11  custody, but prison officials had just investigated and rejected that request.  He was then single-

12  celled until June 27.  On the evidence in the record even viewed in Mr. Toscano's favor, no

13  reasonable jury could conclude that defendants were deliberately indifferent in returning him to

14  general population on June 24, 2011.

15       On June 27, 2011, Mr. Ramirez was moved into Mr. Toscano's cell.  Mr. Toscano concedes

16  that Mr. Ramirez did not arrive with an intent to attack him and that Mr. Ramirez attacked him only

17  after receiving an order from another inmate to do so – an order Mr. Toscano thinks was issued after

18  both inmates had left their cell to shower and were already on the second tier of the housing unit.

19  Mr. Toscano's lack of a sense of danger from Mr. Ramirez is evident from his decision to go

20  upstairs at the same time Mr. Ramirez was going upstairs to shower, rather than to go to the lower

21  shower to lock himself in or going to a correctional officer to seek immediate protection.

22       In the few short hours they were cellmates, Mr. Toscano did ask several times to move away

23  from Mr. Ramirez.  Mr. Toscano's requests were cast in terms of his cellmate's allegedly different

24  status and not because Mr. Ramirez had said or done anything threatening to him.  And Mr. Toscano

25  was using categorizations that were different from those used by prison officials, which may have

26  led to some confusion.  For example, Mr. Toscano told a guard that Mr. Ramirez was an active gang

27  member because Mr. Toscano thought all Northern Hispanic inmates in general population were in a

28  gang if they were, in his words, "functioning/programming."  Mr. Toscano provides no competent

**United States District Court**
For the Northern District of California

1    evidence to support his belief, and his belief leaves no room for the large group of inmates who are

2    not involved in any gang and does not take into account the fact that Northerners were not a gang.

3    Thus, when Mr. Toscano said Mr. Ramirez was "active" and he was "non-affiliated," Mr. Toscano

4    was using terms differently than prison officials used those terms because Mr. Ramirez indisputably

5    was not known to prison officials to be an active gang affiliate, and Mr. Toscano was "inactive" but

6    no prison official had designated him as "non-affiliated."  When prison officials checked the bed

7    cards for the inmates after Mr. Toscano protested being celled with Mr. Ramirez, they saw that Mr.

8    Ramirez and Mr. Toscano were both classified as Northerners.  Mr. Toscano spoke to prison

9    officials about his desire to move away from Mr. Ramirez, but provides no evidence that he

10    expressed any urgency or imminent danger when he requested the move, and fails to show that any

11    defendant was deliberately indifferent to his safety in the few hours that Mr. Ramirez and Mr.

12    Toscano were cellmates before they fought moments after their release from the cell.

13        Mr. Toscano states that he told C/O Bustamante and Garza that he could not live with Mr.

14    Ramirez because Mr. Ramirez was an active gang member and Mr. Toscano was protected custody

15    SNY – neither of which was correct.  Garza recalls the conversation as being that Mr. Toscano said

16    Mr. Ramirez was a Northerner and Mr. Toscano was a nonaffiliate.  Even accepting Mr. Toscano's

17    version of what he said as true, it is undisputed that Garza checked their bed cards in the program

18    unit and saw that both Mr. Toscano and Mr. Ramirez were identified as Northerners.  And it is

19    undisputed that Garza also told another officer of Mr. Toscano's comment, and the other officer also

20    verified that both inmates were Northerners.  There is no evidence that prison officials viewed the

21    "Northerner" label as meaning that the inmate was in a prison gang.  Nor is there any evidence

22    (other than Mr. Toscano's assertion) that Mr. Ramirez was in fact an active gang member.  Far from

23    reacting with deliberate indifference, prison officials checked into Mr. Toscano's claims and

24    determined that the cellmates had the same status and did not need to be separated for that reason.

25        Mr. Toscano also argues that Mr. Ramirez should not have been celled with him because the

26    inmates had not signed a double-celling chrono agreeing to be double-celled with each other.  Mr.

27    Toscano has failed to provide competent evidence to dispute defendants' evidence that the double-

28    celling chrono is not used every time an inmate is given a cellmate.  Inmates, like Mr. Ramirez, who

**United States District Court**
For the Northern District of California

1  arrived at Pelican Bay from a reception center would often be double-celled without either inmate

2  signing the form.

3        Mr. Toscano's case is analogous to the case of *Labatad v. Corrections Corp. of America*, 714

4  F.3d 1155 (9th Cir. 2013).  In *Labatad*, the Ninth Circuit affirmed summary judgment in favor of

5  prison officials against a deliberate indifference claim from an inmate who was assaulted by a

6  member of a rival prison gang with whom he was temporarily assigned to share a cell in a prison

7  that did not house rival gangs separately.  *Id.* at 1157.  The plaintiff in *Labatad* was a gang member

8  and fought with a member of another gang, after which both combatants told prison investigators

9  that the fight was not gang related and that they had no further issues.  *Id.*  Plaintiff then was put in

10  ad-seg and assigned to share a cell with another inmate from the same gang as the inmate with

11  whom plaintiff had just fought.  *Id.*  There had been no difficulties with the new cellmate during the

12  extended period both had been in general population, there had been no threats from the new

13  cellmate, and the new cellmate was not identified as an enemy or risk to the plaintiff.  *Id.*  Three

14  days after moving in, the new cellmate assaulted the plaintiff.  *Id.*  The attacking cellmate later said

15  that he assaulted plaintiff because they were from different gangs and thought he (the cellmate)

16  would be attacked unless he did so first.  *Id.*  The Ninth Circuit concluded that the evidence did not

17  preclude summary judgment on the claim that prison officials were deliberately indifferent to a

18  substantial risk that the new cellmate would assault plaintiff if the two were housed in the same cell.

19  *Id.* at 1161.  The court noted the absence of prior conflict between plaintiff and the new cellmate

20  and the assurances that the earlier fight was not gang related.  *Id.* at 1161.  The court rejected the

21  plaintiff's argument that his "evidence that he told [a prison] officer that he should not be housed

22  with [the new cellmate]" was sufficient to defeat summary judgment; plaintiff had not specified who

23  he told or what he told them to raise a triable issue "that the defendants knew of facts supporting an

24  inference and drew the inference of a substantial risk to [plaintiff] if he was placed in a cell with" the

25  new cellmate.  *Id.*

26        Mr. Toscano's case is like *Labatad* in that there was no evidence of prior conflict between

27  Mr. Toscano and Northerners in general or with Mr. Ramirez in particular, there was no evidence of

28  recent threats to Mr. Toscano, and Mr. Ramirez had not been listed as an enemy of Mr. Toscano.

They also were not members of rival gangs.  There was no obvious basis for prison officials to anticipate the likelihood of tension and conflict between the two.  Unlike *Labatad*, what Mr. Toscano said when he asked to be moved away from Mr. Ramirez is not sufficient to raise a triable issue "that the defendants knew of facts supporting an inference and drew the inference of a substantial risk to [Toscano] if he was placed in a cell with" Mr. Ramirez.  *Id.*

Analysis of the present case also is guided also by the dissimilarities between Mr. Toscano's facts and those in *Cortez v. Skol*, 776 F.3d 1046 (9th Cir. 2015), a case in which the Ninth Circuit reversed the grant of summary judgment on a deliberate indifference claim from an inmate who was attacked by two fellow inmates while all three were being escorted through a dangerous part of the prison by a single guard.  In *Cortez*, there was sufficient evidence to support a finding of deliberate indifference by the defendant who had attempted to escort the three inmates single-handedly: there was evidence that the officer knew about the hostility between the inmates based on the inmates' harassing conversation, evidence that the officer was aware of the plaintiff's protective custody status, and evidence that the officer knew prison policy required leg restraints for these inmates during escort but did not put them in leg restraints.  *See id.* at 1052-53.  By contrast, in Mr. Toscano's case, there were no comparable facts to make the defendants aware of the risk: there was no evidence of likely tension that anyone engaged in harassing conversation with Mr. Toscano or otherwise expressed hostility toward him before Mr. Ramirez and Mr. Toscano exited their cell at shower time on June 27, that Toscano was a protected custody inmate, or that defendants knew of a policy contrary to the steps they took.

Even when the evidence is viewed in the light most favorable to Mr. Toscano, and inferences therefrom drawn in his favor, a reasonable jury could not find that defendants were deliberately indifferent to a known risk to Mr. Toscano's safety. Defendants are entitled to summary judgment in their favor because Mr. Toscano has not established a genuine issue for trial as to whether any of the defendants were deliberately indifferent to a risk to his safety.  *See Celotex*, 477 U.S. at 324

(The fight between Mr. Ramirez and Mr. Toscano, as well as the use of force by C/Os Thompson and Eberly are discussed later, in Section B.)

32

United States District Court
For the Northern District of California

1                d.    Mr. Toscano's Housing After The Fight

2         After the June 27, 2011 fight, prison officials put Mr. Toscano into ad-seg and then, upon

3 Mr. Toscano's request, put him in the TPU/SNY.[10]  Prison officials thereafter considered Mr.

4 Toscano's case several times and often came to different conclusions because of the mixed

5 information about him as well as disagreement about CDCR housing policies.  Ultimately, the

6 highest authority on housing matters, the DRB, decided not to place him in an SNY.  Mr. Toscano

7 has failed to raise a triable issue in support of his claim that defendants were deliberately indifferent

8 in their housing decisions that led to his removal from the TPU/SNY and eventual transfer to

9 Corcoran's SHU.

10         The evidence shows that Mr. Toscano was endorsed for SNY housing and placed in the TPU

11 to wait for transfer to a prison with an SNY.  When the endorsement for an SNY expired in

12 December 2011, C/C Soderlund looked at his case and realized that Mr. Toscano actually was not

13 supposed to be in the SNY under the CDCR's policy because he had not debriefed.  To Mr.

14 Toscano's dismay, C/C Soderlund caused him to be moved back to ad-seg to wait for an ICC to

15 review his case.  Thereafter, the ICC recommended SNY placement, and the CSR disagreed with

16 that recommendation and sent the case to the chief deputy warden, and eventually Mr. Toscano's

17 case was referred to the DRB, which was the ultimate housing authority in the CDCR.  At the DRB

18 hearing on October 24, 2012, the DRB determined that Mr. Toscano should be transferred to the

19 Corcoran SHU after considering information that Mr. Toscano was inactive, did not wish to debrief,

20 did not wish to be housed in general population, and had entered the general population in March

21 2011 with a plan to attack a Northerner before seeking protective custody.  The DRB reasonably

22 considered Mr. Toscano's safety as well as the safety of other inmates, especially given Mr.

23 Toscano's previous admission that he planned to attack another inmate in general population.

24  *See Berg*, 794 F.2d at 462.  There is simply no evidence to support Mr. Toscano's speculation that

25 the DRB or any of the other decisionmakers were trying to set him up for assault/murder.

26 _____

27     [10] The Court occasionally refers to the TPU/SNY together because they had the same function.  The TPU, or Transitional Program Unit, was the name of the housing unit at Pelican Bay

28 in which inmates who have been endorsed for housing in an SNY are housed while they await transfer to a prison with an SNY.

United States District Court
For the Northern District of California

1    The disagreement among the classification committees, classification staff representatives

2    and counselors in the TPU regarding Mr. Toscano's housing does not support a reasonable inference

3    that defendants were deliberately indifferent to his safety.  There was confusion as to what the

4    CDCR policy was, as is evidenced by, for example, by the January 19, 2012 ICC memo stating that

5    the CSR had not identified the source of the supposed policy requiring debriefing before SNY

6    placement, which was followed by a CSR's response with a description of the documents that

7    showed the written policy.  *See* Docket # 199-3 at 15, 16.  Mr. Toscano's case presented some

8    conflicting facts.  On the one hand, he had been attacked by Mr. Ramirez and had asked for SNY

9    placement.  On the other hand, the information about potential safety concerns was mixed

10   information and was at least seven years old, Mr. Toscano had admitted intending to attack an

11   inmate upon his release in March 2011, Mr. Toscano had not debriefed and Mr. Toscano had a

12   notable (albeit old) disciplinary history involving violence and weapons.  *See* footnote 3, *supra*.

13   Prison officials thus faced a choice that implicated competing institutional concerns for the safety of

14   prison staff or other inmates.  *Berg*, 794 F.2d at 461. Due to disagreement between the ICC and CSR

15   about his housing, Mr. Toscano's case was referred to the DRB.  The decision-making process

16   reflects Defendants' attempts to reconcile CDCR policy with Mr. Toscano's repeated assertion that

17   he belonged on an SNY.  On the evidence in the record, a reasonable jury could not conclude that

18   prison officials knew of and disregarded a substantial risk of serious harm to Mr. Toscano when they

19   made the challenged decisions.

20       Mr. Toscano argues that, as of about May 2012, prison officials knew he wanted to be

21   transferred to an out-of-state or federal facility, but fails to explain how defendants' failure to accede

22   to that demand reflected deliberate indifference to his safety.  Prison officials had a place for him in

23   the California prison system in the Corcoran SHU, and Mr. Toscano has not demonstrated that such

24   a placement was in deliberate indifference to his safety.  The Eighth Amendment does not entitle an

25   inmate to any particular housing unit and instead commands that prison officials not inflict cruel and

26   unusual punishment which, in the present context, requires that they not be deliberately indifferent

27   to a substantial risk of serious harm to an inmate.  Prison officials have many ways to address safety

28   concerns, and the Eighth Amendment does not specify the particular methods they employ to keep

**United States District Court**
For the Northern District of California

1    their charges safe.  Prison officials chose the Corcoran SHU for Mr. Toscano, and there is no

2    evidence that he has been harmed at that facility.

3           Finally, Mr. Toscano's damages claims regarding the housing decisions after June 27, 2011

4    fail for a separate reason.  "[P]laintiffs alleging deliberate indifference must also demonstrate that

5    the defendants' actions were both an actual and proximate cause of their injuries."  *Lemire v.*

6    *California Dep't of Corr. and Rehab.*, 726 F.3d 1062, 1075 (9th Cir. 2013).  Mr. Toscano presents

7    no evidence that he suffered any harm as a result of his placement in the housing units in which he

8    was placed  after the June 27, 2011 fight or as a result of his transfer to the Corcoran SHU, and

9    therefore cannot recover damages on his deliberate indifference claim with respect to those

10   decisions.

11          2.      Qualified Immunity

12          The defense of qualified immunity protects "government officials . . . from liability for civil

13   damages insofar as their conduct does not violate clearly established statutory or constitutional

14   rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818

15   (1982).  The rule of qualified immunity "'provides ample protection to all but the plainly

16   incompetent or those who knowingly violate the law.'"  *Burns v. Reed*, 500 U.S. 478, 495 (1991)

17   (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

18          In *Saucier v. Katz*, 533 U.S. 194 (2001), the Supreme Court set forth a two-step inquiry for

19   determining whether qualified immunity exists.  First, "[t]aken in the light most favorable to the

20   party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional

21   right?"  *Id.* at 201.  If no constitutional right was violated if the facts were as alleged, the inquiry

22   ends and defendants prevail.  *See id.*  If, however, "a violation could be made out on a favorable

23   view of the parties' submissions, the next, sequential step is to ask whether the right was clearly

24   established. . . .  'The contours of the right must be sufficiently clear that a reasonable official would

25   understand that what he is doing violates that right.'  The relevant, dispositive inquiry in

26   determining whether a right is clearly established is whether it would be clear to a reasonable officer

27   that his conduct was unlawful in the situation he confronted."  *Id.* at 201-02 (quoting *Anderson v.*

28   *Creighton*, 483 U.S. 635, 640 (1987)).  Although *Saucier* required courts to address the questions in

United States District Court
For the Northern District of California

1    the particular sequence set out above, courts now have the discretion to decide which prong to

2    address first, in light of the particular circumstances of each case.  *See Pearson v. Callahan*, 555

3    U.S. 223, 236 (2009).

4         The first step under *Saucier* is to determine whether a constitutional violation was alleged.

5    As shown in the preceding discussion, the evidence in the record does not establish an Eighth

6    Amendment violation.  Even if the evidence did establish such a violation, that would only satisfy

7    the first step of the *Saucier* analysis.

8         The next step under *Saucier* is to consider whether the contours of the right were clearly

9    established, an inquiry that "must be undertaken in light of the specific context of the case, not as a

10   broad general proposition."  *Saucier*, 533 U.S. at 201.  The law was clearly established that a

11   correctional officer could not disregard a substantial risk of serious harm to an inmate of which he

12   was aware and had a duty to protect an inmate from violence at the hands of other inmates.  *See*

13   *Farmer*, 511 U.S. at 833.  However, no case had held that inmates had a right to automatically be put

14   in SNY upon request.

15        The Ninth Circuit clarified the qualified immunity analysis for a deliberate indifference

16   claim in *Estate of Ford v. Ramirez-Palmer*, 301 F.3d 1043, 1050 (9th Cir. 2002).  In *Estate of Ford*,

17   the court stated "it would have been clear to a reasonable prison official that if he knew about an

18   excessive risk to inmate safety, and inferred from the facts of which he was aware that a substantial

19   risk of serious harm exists, he would violate the law by disregarding it."  The court explained that,

20   for an Eighth Amendment violation based on a condition of confinement (such as a safety risk), the

21   official must *subjectively* have a sufficiently culpable state of mind, i.e., "'a prison official cannot be

22   found liable under the Eighth Amendment for denying an inmate humane conditions of confinement

23   unless the official knows of and disregards an excessive risk to inmate health or safety; the official

24   must both be aware of facts from which the inference could be drawn that a substantial risk of

25   serious harm exists, and he must also draw the inference."  Thus, a reasonable prison official

26   understanding that he cannot recklessly disregard a substantial risk of serious harm, could know all

27   of the facts yet mistakenly, but reasonably, perceive that the exposure in any given situation was not

28   that high.  In these circumstances, he would be entitled to qualified immunity."  *Estate of Ford*, 301

United States District Court

For the Northern District of California

1  F.3d at 1050 (citations omitted).  In *Estate of Ford*, the court explained that even though the general

2  rule of deliberate indifference had been expressed in *Farmer*, no authorities had "fleshed out 'at

3  what point a risk of inmate assault becomes sufficiently substantial for Eighth Amendment

4  purposes.'" *Estate of Ford*, 301 F.3d at 1051 (quoting *Farmer*, 511 U.S. at 834 n.3).  Because it had

5  not been fleshed out in that case, "it would not be clear to a reasonable prison official when the risk

6  of harm from double-celling psychiatric inmates with one another changes from being *a* risk of *some*

7  harm to a *substantial* risk of *serious* harm.  *Farmer* left that an open issue.  This necessarily informs

8  'the dispositive question' of whether it would be clear to reasonable correctional officers that their

9  conduct was unlawful in the circumstances that [they] confronted." *Estate of Ford*, 301 F.3d at 1051

10  (emphasis in original).

11          *Estate of Ford* further mandates dismissal of Mr. Toscano's case.  Before the June 27, 2011

12  fight, it would not have been clear to a reasonable prison official when the risk of harm from placing

13  Mr. Toscano in general population rather than an SNY increased from a risk of some harm to a

14  substantial risk of serious harm.  Prison officials had an inmate with mixed information, and they

15  had a long-standing concern about inmates trying to gain access to the SNY to attack inmates who

16  had debriefed.  At the time officials made their decisions before the fight with Mr. Ramirez on June

17  27, 2011, the circumstances prison officials faced included old information in Mr. Toscano's

18  confidential file from 2002 and 2004 that suggested both that he might be a target and that he was in

19  good standing with the Northern Structure, the existence of information in his file that he had not

20  had problems with other gang affiliates, and his expressed desire in early 2011 to go to general

21  population.  *Cf. Castro v. County of Los Angeles*, 785 F.3d 336, 348-49 (9th Cir. 2015) (defendant

22  not entitled to qualified immunity for putting an intoxicated, combative stranger in a sobering cell

23  with bumbling drunken plaintiff who had been arrested for his own safety, without any basis to

24  conclude the risk of altercation was minimal; distinguishing *Estate of Ford* based on the latter's

25  reasoned decision-making with input from the concerned parties and file review).

26          As for the events of June 27, 2011, when Mr. Ramirez was moved into Mr. Toscano's cell, it

27  would not have been clear to a reasonable official when the risk of double-celling these inmates

28  increased from a risk of some harm to a substantial risk of serious harm.  Prison officials understood

1  Mr. Toscano to be asking for a convenience move, and not to be expressing an urgent need for a

2  move because he was in danger.  Mr. Toscano had mentioned that Mr. Ramirez and he each had a

3  different status, but prison officials reasonably checked into his statements and determined that both

4  inmates were listed as Northerners, without either being listed as active in a prison gang.  A

5  reasonable prison official could reasonably perceive that the inmate's exposure to any risk of harm

6  was not substantial in the absence of a specific threat from Mr. Ramirez.

7  Because the law and the facts here did not put defendants on notice that their conduct would be

8  clearly unlawful, summary judgment based on qualified immunity is appropriate.  *See Saucier*, 533

9  U.S. at 202.

10      As to the housing decisions after the fight – when Mr. Toscano was not sent to general

11  population and was eventually refused SNY housing – a reasonable prison official would not have

12  thought it unlawful to refuse to put Mr. Toscano in SNY under the known circumstances.  A

13  reasonable official could reasonably perceive that the inmate's exposure to any risk of harm was not

14  substantial when there was evidence that Mr. Toscano had not debriefed, had a confidential file that

15  had old and mixed information as to the possibility of a threat against him, had intended in March

16  2011 to attack a Northern inmate, and had an old but violent disciplinary record.

17      Defendants met their burden of proof in their moving papers, and Mr. Toscano did not

18  introduce evidence to show the existence of a genuine issue of fact on the defense.  Defendants are

19  entitled to judgment as a matter of law on the qualified immunity defense to the deliberate

20  indifference to safety claims.

21  B.    Excessive Force

22      Whenever prison officials stand accused of using excessive physical force in violation of the

23  Eighth Amendment, the core judicial inquiry is whether force was applied in a good-faith effort to

24  maintain or restore discipline, or maliciously and sadistically to cause harm.  *Hudson v. McMillian*,

25  503 U.S. 1, 6 (1992) (citing *Whitley v. Albers*, 475 U.S. 312, 317 (1986)).  In determining whether

26  the use of force was for the purpose of maintaining or restoring discipline, or for the malicious and

27  sadistic purpose of causing harm, a court may evaluate the need for application of force, the

28  relationship between that need and the amount of force used, the extent of any injury inflicted, the

United States District Court

For the Northern District of California

1   threat reasonably perceived by the responsible officials, and any efforts made to temper the severity

2   of a forceful response.  *See Hudson*, 503 U.S. at 7; *see also Spain v. Procunier*, 600 F.2d 189, 195

3   (9th Cir. 1979) (guards may use force only in proportion to need in each situation).

4           As evident in the "Background" section above, the parties' versions of the incident differ

5   sharply with regard to the amount of force used on Mr. Toscano on June 27, 2011.  Mr. Toscano has

6   shown a triable issue as to whether defendants' use of force by C/Os Eberly and Thompson

7   amounted to excessive force.  Mr. Toscano's version is that he was "excessively sprayed . . . in the

8   face (eyes) from (1) feet away" with pepper spray, and then defendants "began hitting plaintiff in the

9   head and ears with the batons causing plaintiff's head and ears to swell up . . . [and] also began

10  kicking plaintiff in the back–ribs, arm, causing serious injuries to plaintiff."  Docket # 217 at 18.

11  According to Mr. Toscano, he was then deliberately dropped face-first onto the floor from a height

12  of three or four feet while he was in restraints.  A reasonable trier of fact could find that Mr.

13  Toscano was dropped purposefully based on his evidence that he was "picked up half ways, then

14  deliberately dropped face first."  Docket # 20 at 16; *see also* Docket # 217 at 18 ("plaintiff was put

15  in restraints pick up about (4) feet and dropped causing injuries, swelling to plaintiff left knee, chest,

16  lip." (errors in source)).  The evidence that Mr. Toscano was dropped presents the strongest point for

17  him because, at that point, the fight had ended, and there was no need for an application of force and

18  no threat was reasonably perceived by the officer.  *See Hudson*, 503 U.S. at 7.  Purposefully

19  dropping an already handcuffed inmate who was not resisting face first onto the floor is just the sort

20  of malicious and sadistic use of force for the very purpose of causing harm that is prohibited by the

21  Eighth Amendment.  *See id.* at 6-7.  Mr. Toscano's evidence is in marked contrast to defendants'

22  evidence that Mr. Toscano was squirted once with pepper spray from a distance of 7 feet, was hit

23  once with a baton, and was not dropped.

24          If believed, Mr. Toscano's version would lead to a conclusion that C/Os Eberly and

25  Thompson used excessive force in violation of the Eighth Amendment.  If believed, the version of

26  C/Os Eberly and Thompson would permit a jury to conclude that the force used was a reasonable

27  and tempered response in an effort to restore order in the prison.  Summary judgment is not the place

28  for credibility determinations.  Mr. Toscano has established a "genuine issue for trial'" concerning

United States District Court

For the Northern District of California

1   whether he was dropped on the floor and whether defendants repeatedly hit him with their batons

2   and kicked him on June 27, 2011, conduct which could constitute excessive force under certain

3   circumstances. *Celotex Corp.*, 477 U.S. at 324 (quoting former Fed. R. Civ. P. 56(e)).  Summary

4   judgment therefore is not appropriate on the Eighth Amendment excessive force claim against these

5   two defendants.

6          The photos of Mr. Toscano's injuries show only some redness and slight abrasions on Mr.

7   Toscano.  Mr. Toscano states that he received "a mild concussion," but there is no evidence that any

8   trained professional diagnosed him with a concussion.  Docket # 228 at 3.  Mr. Toscano accuses

9   defendants of submitting photos of his injuries that "are clearly altered/photoshopped," and that the

10  photos he submitted on May 13, 2014 show the discrepancies.  Docket # 228 at 2-3.  The Court has

11  compared the photos filed by Mr. Toscano (i.e., Docket # 142 at 74-87) with the photos at Exhibit F

12  to the Barneburg Declaration (i.e., Docket # 189-3 at 1-12), and sees nothing in the latter photos

13  suggesting they were photoshopped or altered.  A far more reasonable explanation for any

14  differences in the documents is that photocopy quality deteriorates with each generation of copying

15  – a process called generation loss – so that a copy made of a copy of an original is not as crisp as the

16  original, and a copy made of a copy of a copy is even less crisp.[11]

17         The parties disagree as to whether Mr. Toscano was stabbed, but that really does not matter

18  for purposes of liability on his excessive force claim.  An inmate with a weapon or an inmate seen

19  stabbing another inmate might support a greater use of force to subdue fighting inmates, but here it

20  is undisputed that defendants saw neither a weapon nor signs of a stabbing at the time they used

21  force.

22         The same factual disputes that preclude summary judgment on the excessive force claim

23  preclude summary judgment on the qualified immunity defense for C/O Eberly and Thompson.

24  There is a dispute of facts as to whether a reasonable official would not have thought it lawful to

25  _____

26         [11]  Generation loss appears to be on display in this case in the different copies of the
    document that is labeled TOSPROD000000-A.   The electronically filed copy at Docket # 189-3 at 4
27  is perhaps the clearest (as it shows freckles and chest hairs); the color copy of that document
    submitted by defendants as a courtesy copy to the Court is slightly less clear; the black and white
28  paper copy of that document filed by plaintiff (Docket # 228) is even less clear; and the scanned
    version of that copy (Docket # 228 at 72) is the least clear.

1  kick, repeatedly strike with a baton, squirt pepper spray extensively under the circumstances claimed

2  by Mr. Toscano, and then drop a restrained inmate face-first.

3  C.      Retaliation

4          A prisoner has a First Amendment right to file grievances against prison officials without

5  being subjected to retaliation in response thereto.  *Watison v. Carter*, 668 F.3d 1108, 1114 (9th Cir.

6  2012).  "Within the prison context, a viable claim of First Amendment retaliation entails five basic

7  elements:  (1) An assertion that a state actor took some adverse action against an inmate (2) because

8  of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his

9  First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional

10 goal."  *Rhodes v. Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2005) (footnote omitted).

11         Defendants do not dispute that Mr. Toscano engaged in activity protected by the First

12 Amendment before they acted in response to Mr. Toscano's safety concerns, housing requests and

13 inmate appeals about them.  Instead, they argue that Mr. Toscano's retaliation claims fail because he

14 cannot show a chilling effect, a causal connection or the absence of a legitimate penological purpose

15 for defendants' actions.

16         Chilling effect:  To prevail on a retaliation claim, a plaintiff must show a chilling effect on

17 his First Amendment rights.  The proper inquiry is "'whether an official's acts would chill *or* silence

18 a person of ordinary firmness from future First Amendment activities.'"  *Rhodes*, 408 F.3d at 568

19 (quoting *Mendocino Envtl. Ctr. v. Mendocino County*, 192 F.3d 1283, 1300 (9th Cir. 1999).

20 Defendants argue that Mr. Toscano did not show a chilling effect because he continued to pursue

21 prison grievances.  The fact that Mr. Toscano continued to file inmate appeals and send letters does

22 not negate the existence of this element because the chilling effect need not be so great as to totally

23 silence the inmate.  *See Rhodes*, 408 F.3d at 568-69 (rejecting argument that inmate did not state a

24 claim for relief because he had been able to file inmate grievances and a lawsuit).

25         Causal connection:  A prisoner must show a "causal connection between the adverse action

26 and the protected conduct."  *Watison*, 668 F.3d at 1114.  Mere speculation that a defendant acted out

27 of a retaliatory motive is not enough.  *See Wood v. Yordy*, 753 F.3d 899, 904-05 (9th Cir. 2014)

28 (affirming grant of summary judgment where no evidence that defendants knew about plaintiff's

41

United States District Court

For the Northern District of California

1    prior lawsuit, or that defendants' disparaging remarks were made in reference to prior lawsuit).

2    "[T]iming can properly be considered as circumstantial evidence of retaliatory intent," although

3    timing alone is not enough to support a finding of retaliation. *Pratt v. Rowland*, 65 F.3d 802, 808

4    (9th Cir. 1995); *see, e.g.*, *Huskey v. City of San Jose*, 204 F.3d 893, 899 (9th Cir. 2000) (summary

5    judgment proper against plaintiff who could only speculate that adverse employment decision was

6    due to his negative comments about his supervisor six or seven months earlier); *Pratt*, 65 F.3d at 808

7    (error to find that the allegedly retaliatory action that preceded a television interview was caused by

8    the interview).

9         Mr. Toscano has not proven or shown a triable issue that defendants took their actions

10   because of his First Amendment activities.  No reasonable jury could find that the decisions to not

11   place him in an SNY and not to accede to his housing requests were made to retaliate because of Mr.

12   Toscano's inmate appeals and letters.  The timing alone is insufficient to demonstrate the necessary

13   causal connection (particularly where there is little proximity between the protected activity and the

14   alleged act of retaliation).  For instance:

15   • Defendant Clower was hostile to Mr. Toscano on June 21, 2011 and wrote a chrono
          with false information thereafter, according to Mr. Toscano.  Mr. Toscano states that
16        Clower's actions were in retaliation for Mr. Toscano "exercising his 1st Amend. right
          to appeal and would not withdraw his false validation appeal against him and other
17        officials."  Docket # 20 at 15 (error in source).  Mr. Toscano does not identify the
          date on which his inmate appeal was filed and decided.  Mr. Toscano also states that
18        Clower was retaliating against him "for pursuing litigation against him and other
          officials."  Docket # 217 at 5, but does not identify date(s) of such litigation activity.
19        Mr. Toscano further states that Clower acted adversely to him  "in retaliation because
          plaintiff told G. D. Lewis (warden), sgt. R. Basso, Lt. Manion, Lt. D. Strain, (AW)
20        P.T. Smith, (AW) M. A. Cook, Capt. R. Bell, R. Clower, J. Rush, L. Webster and
          Does 1-20, numerous times that plaintiff would testify against them if they were
21        fabricating reports."  Docket # 20 at 16.  Mr. Toscano does not provide the dates on
          which his First Amendment activities occurred.
22
     • Defendant Basso wrote a report that caused Mr. Toscano to be sent to ad-seg on or
23        about January 10, 2012.  This was done to retaliate against Mr. Toscano "for filing
          complaints and telling officials and sgt. Basso he would testify against them if they
24        were fabricating their reports."  Docket # 221 at 3.  Mr. Toscano does not provide the
          dates on which his First Amendment activities occurred.
25
     • Defendants Bustamante, Garza, and Eberly allowed Ramirez to be put in Mr.
26        Toscano's cell on June 27, 2011, and defendant Eberly and Thompson used excessive
          force on Mr. Toscano on that date.  All this allegedly was "in retaliation because
27        plaintiff told G. D. Lewis (warden), sgt. R. Basso, Lt. Manion, Lt. D. Strain, (AW)
          P.T. Smith, (AW) M. A. Cook, Capt. R. Bell, R. Clower, J. Rush, L. Webster and
28        Does 1-20, numerous times that plaintiff would testify against them if they were

United States District Court

For the Northern District of California

fabricating reports." Docket # 20 at 16. Mr. Toscano does not provide the dates on which he made his statements.

• Defendants Soderlund, Melton and Wilber caused Mr. Toscano to be sent to ad-seg on or about December 9, 2011 after Mr. Toscano declined to withdraw grievances and appeals as they requested. Docket # 20 at 19. Mr. Toscano does not identify the grievances and appeals to which he refers. *Id.*

• Defendant Basso also allegedly told Mr. Toscano on December 31, 2011, that "he can withdraw his appeal or go back to ad seg." Docket # 20 at 20. It would appear that this pertained to a pending inmate appeal, although there may have been several pending at the time.

• Defendants involved in the May 23, 2012 ICC (i.e., Defendants Perez, Still, Cruse, and Bradbury) decided to retain Mr. Toscano in ad-seg. And Defendant Perez issued a CDC-114D notice two days earlier, on May 21, 2012, that Mr. Toscano was being retained in ad-seg and referred to the DRB. Docket # 20 at 24. Mr. Toscano states that their actions were in retaliation for his refusal to withdraw his appeals and because he told numerous prison officials he would testify against officials if they were fabricating reports. Docket # 217 at 21.

• Defendants on the October 24, 2012 DRB (comprised of Defendants Hubbard, Speer, Schoening, Alkire and Davis) decided to rescind Mr. Toscano's SNY status and transfer him to the Corcoran SHU. This allegedly was "in retaliation" "because plaintiff has expressed to officials the things going on, on the (SNY) yards in which officials allow new prison gangs to form & function etc." Docket # 12 at 1. Mr. Toscano attached to his supplemental complaint an October 18, 2012 letter addressed to the DRB that indicated it was his tenth letter to the DRB about his concerns. *Id.* at 6-7. He also attached an October 18, 2012 letter to the office of internal affairs requesting an investigation of the CDCR and its departments.

Only three of these events had anything other than timing to support Mr. Toscano's claim that Defendants retaliated against him. Defendants made statements that arguably show a retaliatory animus and are suggestive of a causal connection in three instances.

The first instance concerns an interaction with sergeant Basso on April 20, 2011 (described at pp. 13-14 of this order). Sergeant Basso interviewed Mr. Toscano on April 15, 2011, and allegedly told Mr. Toscano that Mr. Toscano would go to an SNY in 2-3 weeks after sergeant Basso's report; two days later, Mr. Toscano filed an inmate appeal about sergeant Basso's interview because another correctional officer told Mr. Toscano that he would not be sent to an SNY for 6-12 months. On April 20, sergeant Basso came to talk to Mr. Toscano about the appeal, "stating he can stop his report and address the appeal, or let him finish typing his report. Then he'll get plaintiff sent to" TPU for SNY. Docket # 20 at 14. Mr. Toscano did not trust sergeant Basso so he sent his inmate appeal back to sergeant Basso, apparently to go forward with the appeal. Eventually,

United States District Court

For the Northern District of California

1   sergeant Basso issued a memorandum dated May 5, 2011 that allegedly led to Mr. Toscano not

2   being sent to an SNY.[12]  The evidence is undisputed, however, that the May 5 memorandum was a

3   "shortened, final version" of an April 16 memorandum sergeant Basso had written expressing the

4   same worry that Mr. Toscano was providing just the minimum amount of information to get to the

5   SNY to proceed with an "unknown agenda."  Docket # 194 at 4.  A reasonable jury could not infer

6   that Mr. Toscano's April 17 inmate appeal caused sergeant Basso to write the adverse May 5

7   memorandum because sergeant Basso already had written that same information in a draft

8   memorandum on April 16, a day before Mr. Toscano wrote his inmate appeal.

9       The second instance where a statement suggestive of retaliatory intent was made was on or

10   about December 9, 2011, when Defendants Melton and Soderlund allegedly told Mr. Toscano he

11   could stay in the TPU if he withdrew his "failure to protect/staff complaint appeal etc." and, if not,

12   he would be taken off protected custody and placed in ad-seg. Docket # 20 at 19.  Defendant Wilber

13   expressed the same sentiment "sometime after that."  *Id.*  Mr. Toscano decline both offers, and filed

14   an inmate appeal on December 13, 2011.  Mr. Toscano apparently was in ad-seg for not more than

15   five days (i.e., from December 9 through December 14, 2011).  *Id.* at 20.  Even accepting as true that

16   Defendants made the statements Mr. Toscano attributes to them, this retaliation claim fails because

17   Defendants' actions of putting Mr. Toscano ad-seg were in furtherance of a legitimate correctional

18   goal: as an inmate who had not debriefed, Mr. Toscano did not belong in the SNY.  *See* Docket #

19   199-3 at 31 (December 9, 2011 CDC-114D for ad-seg placement served by Soderlund, and signed

20   by Wilber stated: "Based upon CDCR policy, your current SNY endorsement is not appropriate, as

21   you have not completed the debriefing process and/or have not been reviewed by DRB for SNY

22   placement.")

23       The third instance was on December 31, 2011, when sergeant Basso allegedly "told plaintiff

24   he can withdraw his appeal or go back to ad seg.  Plaintiff declined to withdraw his appeal."  Docket

25   # 20 at 20.  Mr. Toscano was sent back to ad-seg on January 10, 2012.  *Id.*  Even accepting as true

26

27       _____

28       [12]  There is no evidence that sergeant Basso had the authority to decide where Mr. Toscano would be housed.  *See* Docket # 194 at 8.  Rather, sergeant Basso wrote a memorandum that was reviewed by other decision-makers.

United States District Court

For the Northern District of California

1    that sergeant Basso made the statement Mr. Toscano attributes to him, this retaliation claim fails

2    because (a) there is no evidence that sergeant Basso thereafter took an adverse action against Mr.

3    Toscano, i.e., there is no evidence that sergeant Basso took part in any decision to send Mr. Toscano

4    back to ad-seg on or after December 31, 2011, and (b) the decision that later was made by other

5    prison officials to return Mr. Toscano to ad-seg was in furtherance of a legitimate correctional goal:

6    as an inmate who had not debriefed, he did not belong in the SNY.  *See* Docket # 199-3 at 29

7    (January 10, 2012 CDC-114D for ad-seg placement stated: "Based upon CDCR policy, an SNY

8    endorsement is not appropriate, as you have not completed the debriefing process and/or have not

9    been reviewed by DRB for SNY placement.")

10          Retaliation is not established simply by showing adverse activity by a defendant after

11    protected speech; rather, a plaintiff must show a nexus between the two. *See Huskey*, 204 F.3d at

12    899 (9th Cir. 2000) (retaliation claim cannot rest on the logical fallacy of *post hoc, ergo propter hoc*,

13    i.e., "after this, therefore because of this"); *see, e.g., id.* (summary judgment proper against plaintiff

14    who could only speculate that adverse employment decision was due to his negative comments

15    about his supervisor six or seven months earlier).  The retaliation claims fail due to the absence of

16    evidence of a causal connection between the protected conduct and the adverse actions.

17          With regard to the use of force by defendants Eberly and Thompson, no reasonable jury

18    could find that their actions were due to Mr. Toscano's First Amendment activity.  Mr. Toscano has

19    offered absolutely no evidence that their spur-of-the-moment response to an inmate fight in which

20    Mr. Toscano was involved was done to retaliate against him for his First Amendment activities.  The

21    complete absence of a causal connection between First Amendment activities and the use of force by

22    these defendants is fatal to the retaliation claim against them.

23          Legitimate correctional goals:  The prisoner bears the burden of pleading and proving

24    absence of legitimate correctional goals for the conduct of which he complains. *Pratt*, 65 F.3d at

25    806.  At that point, the burden shifts to the prison official to show, by a preponderance of the

26    evidence, that the retaliatory action was narrowly tailored to serve a legitimate penological purpose.

27    *See Schroeder v. McDonald*, 55 F.3d 454, 461-62 (9th Cir. 1995) (defendants had qualified

28

United States District Court

For the Northern District of California

1  immunity against retaliation claim based on their decision to transfer prisoner to preserve internal

2  order and discipline and maintain institutional security).

3       Here, Mr. Toscano has failed to prove or raise a triable issue of fact that prison officials'

4  actions did not advance a legitimate correctional goal.  As discussed at length in Section A above,

5  prison officials examined the facts in Mr. Toscano's case and made their decisions in compliance

6  with a CDCR policy against SNY housing for inactive gang associates who had not debriefed, and

7  that policy existed for the protection of inmates who properly were in the SNY.  *See Dietrich v. John*

8  *Ascuaga's Nugget*, 548 F.3d 892, 901 (9th Cir. 2008) (finding no retaliation where plaintiff

9  presented no evidence that defendants gave her a traffic citation after reading a newspaper article

10  about her First Amendment activities, rather than because she drove past a police barricade with a

11  "road closed" sign on it).  Mr. Toscano has not shown a genuine dispute that the perceived threat a

12  non-debriefing inmate posed in an SNY was fabricated or not intended to serve a legitimate

13  penological purpose.  Prison officials disagreed with Mr. Toscano's views that he should be placed

14  in an SNY, but all the record evidence establishes is that the disagreement was based on prison

15  policy rather than animus due to his First Amendment activities.

16       Viewing the evidence and the inferences therefrom in the light most favorable to Mr.

17  Toscano, defendants are entitled to judgment as a matter of law on Mr. Toscano's claim that they

18  retaliated against Mr. Toscano for his First Amendment activity.  Defendants also are entitled to

19  qualified immunity against this claim because they prevail on both prongs of the *Saucier* analysis,

20  i.e., there was no constitutional violation, and reasonable officials in defendants' place would not

21  have thought refusing to move Mr. Toscano to the SNY was unlawful under the circumstances.

22  D.    Doe Defendants

23       The order of service and partial dismissal noted a significant Doe defendant problem in the

24  amended complaint and stated that "[a]ny Doe defendant whose true name and identity has not been

25  provided to the Court by Mr. Toscano by the date scheduled in this order for defendants to file their

26  dispositive motion will be dismissed without prejudice to Mr. Toscano filing a new action against

27  such a person."  Docket # 19 at 13-14.  Mr. Toscano never provided the name of any Doe

28

United States District Court

For the Northern District of California

1  defendants; therefore, all Doe defendants are dismissed without prejudice to Mr. Toscano filing a

2  new action against them if he ever learns their identities.

3  E.   Referral To Pro Se Prisoner Mediation Program

4        The Court has determined that Defendants are entitled to summary judgment on all claims

5  except the claim that C/O Eberly and C/O Thompson used excessive force on Mr. Toscano on June

6  27, 2011.  Therefore, the only claim that remains for adjudication is Mr. Toscano's excessive force

7  claim against defendants Eberly and Thompson.  In light of the narrow dispute remaining, this case

8  appears to be a good candidate for the Court's *pro se* prisoner mediation program and will be

9  referred to that program.  Lest there be any doubt as to the importance and mandatory nature of the

10 mediation proceedings, the parties are hereby ordered to attend the mediation proceedings and take

11 part in them.  Plaintiff is now cautioned that failure to attend or take part in the mediation

12 proceedings will result in the dismissal of this action.

13                          **VI.   CONCLUSION**

14       Defendant's motion for summary judgment is **GRANTED IN PART AND DENIED IN**

15 **PART**.  (Docket # 188.)  Defendants are entitled to judgment in their favor on all claims, except that

16 defendants Eberly and Thompson are not entitled to judgment in their favor on the excessive force

17 claim.

18       Good cause appearing therefor, this case is now referred to Magistrate Judge Vadas for

19 mediation proceedings pursuant to the *Pro Se* Prisoner Mediation Program.  The proceedings will

20 take place **within one hundred and twenty days** of the date this order is filed.  Magistrate Judge

21 Vadas will coordinate a time and date for a mediation proceeding with all interested parties and/or

22 ///

23 ///

24 ///

25 ///

26 ///

27 ///

28 ///

their representatives and, **within seven days** after the conclusion of the mediation proceedings, file

with the Court a report of the proceedings.  The Clerk will send to Magistrate Judge Vadas a copy of

this order.

IT IS SO ORDERED.

Dated: August 19, 2015

_____
EDWARD M. CHEN
United States District Judge

**United States District Court**
For the Northern District of California